Leon HUARD *et al.*

v.

**BOARD OF TRUSTEES, MAINE
STATE RETIREMENT SYSTEM.**

Supreme Judicial Court of Maine.

Argued May 11, 1989.
Decided Aug. 8, 1989.

Daniel P. McIntyre (orally), McIntyre Law Office, Falmouth, Shawn C. Keenan, Augusta, for plaintiffs.

James E. Tierney, Atty. Gen., H. Cabanne Howard (orally), Asst. Atty. Gen., Augusta, for defendant.

Before McKUSICK, C.J., and
ROBERTS, WATHEN, CLIFFORD,
HORNBY and COLLINS, JJ.

McKUSICK, Chief Justice.

Leon Huard and James Dyke retired in 1987 from their positions as junior high school teachers in School Administrative District No. 54 in the Skowhegan area. Their retirement pensions as members of the Maine State Retirement System (MSRS) are set by state statute at a percentage of their "earnable compensation" averaged over their three highest-paid years of participating employment, typically the last three years. *See* 5 M.R.S.A. §§ 17001(4)(A), 17852(1)(A) (1989). Retirement payments for teachers are funded partly by teacher contributions of a prescribed percentage of "earnable compensation" throughout the years of employment and partly by a general state appropriation in lieu of any contribution by the employing school district. *See id.* §§ 17154(6), 17701.

Linking pension levels to peak three-year earnings, while linking retirement fund contributions to teacher earnings over all years of employment, provides an incentive for an employee to minimize his declared "earnable compensation" until his last three years of employment, and then to maximize his declared "earnable compensation" during those last three years, a practice commonly referred to as "ballooning." We agree with the MSRS Board of Trustees that certain cash supplements to plaintiffs' regular salaries, paid by the school

district during their final years of employment, do not fall within the statutory definition of "earnable compensation." We therefore modify the judgment of the Superior Court (Kennebec County, *Alexander, J.*), which vacated the Board's decision in part, and we reinstate the Board's decision in its entirety.

The payments in question were made under two provisions of the collective bargaining agreement entered into by SAD 54 and its teachers' union. The first provision, section D of article XIII ("Salaries"), entitles each teacher who gives SAD 54 notice by December 31 of impending "retirement under a bona fide retirement system" to an "increment" amounting to $1,535 in the school year 1986–87. The second provision, section A of article XIX ("Insurance"), provides each teacher with a specified sum ($1,940 in the school year 1986–87) to allocate at the teacher's discretion within a package of benefit options, which includes health and dental insurance and "salaries." In the school year 1986–87, the last year they worked for SAD 54, both plaintiffs received the "notice increment." In that year and the years immediately preceding, plaintiffs also elected the cash option from the "benefit package."

In August of 1987 MSRS examined plaintiffs' salary records and discovered that plaintiffs' reported "earnable compensation" included payments MSRS considered to be retirement bonuses and payments in lieu of fringe benefits. The MSRS executive director informed each plaintiff that under a long-standing agency interpretation of the governing statute, such payments are not includable in their pension bases.

When Huard and Dyke individually appealed the executive director's determinations to the Board of Trustees, the Board consolidated the two appeals and held a single hearing at which both plaintiffs testified, represented by counsel for the Maine Teachers Association. The Board affirmed the executive director and plaintiffs then commenced this action in the Superior Court for judicial review of final agency action under M.R.Civ.P. 80C. The Superior Court affirmed the Board as to the "notice increment" payments, but agreed with plaintiffs that the "benefit package" payments should have been treated as "earnable compensation" in calculating plaintiffs' pensions. Both sides have appealed.

I.

*The $1,535 Question: The "Notice Increment" Payments*

Because the Superior Court here acted exclusively in an appellate role, we review the decision of the Board of Trustees directly. *See State v. Maine State Employees Ass'n*, 538 A.2d 755, 757 (Me. 1988). The Board ruled that the payments in question were not "earnable compensation," a statutory term of art having only two applications: the computation of retirement pensions and the computation of contributions to the retirement fund. At the time SAD 54 made the payments in question, "earnable compensation" was defined as follows:

13. Earnable Compensation. "Earnable compensation" means salaries and wages, subject to the following inclusions and exclusions.

A. "Earnable compensation" includes:

(1) Workers' compensation benefits;

(2) Maintenance, if any; and

(3) Any money paid by an employer under an annuity contract for the future benefit of an employee.

B. "Earnable compensation" does not include:

(1) Payment for more than 30 days of unused accumulated sick [or vacation] leave ...;

(2) Any other payment which is not compensation for actual services rendered or which is not paid at the time the actual services are rendered; or

(3) Teacher recognition grants paid pursuant to Title 20–A, section 13503–A.

5 M.R.S.A. § 17001(13) (Pamph.1987).[1]

On their cross-appeal, plaintiffs challenge the exclusion from their pension base of payments made under section XIII(D) of the SAD 54 collective bargaining agreement, which provided:

> Any teacher who retires during the term of this contract who gives notice of such retirement by December 31 in the last academic year of employment shall receive a $1,535 increment in 1986–87. Such teacher must qualify for retirement under a bona fide retirement system.

A retirement bonus paid in recognition of long-term service is the paradigmatic instance of "compensation ... not paid at the time the actual services are rendered," expressly excluded from "earnable compensation" under subparagraph B(2) of the statutory definition. Plaintiffs contend, however, that the consideration for the "increments" is not past teaching service over the years but rather the service rendered by a teacher after he gives notice of impending retirement, thus allowing the employer time to recruit a replacement. As they argued before the Superior Court:

> The contract paid varying amounts to teachers who performed additional duties: $455 for the Drill Team coach; $1620 for the year book coordinator; $10 an hour for driver education instructors; ... and $1535 for a teacher who notified the employer far in advance of his intent to retire.

Both the Board and the Superior Court ruled that the "service" of giving notice is "unrelated to the professional teaching services that are the subject of the contract" and that the "notice increment" payments are therefore "not compensation for actual services rendered." It is unnecessary for us to undertake the economic analysis involved in verifying that conclusion because plaintiffs' argument fails even on its own terms. The plain language of the collective bargaining agreement belies any rational relationship between the "service" plain-

tiffs say the "notice increment" compensates and the conditions under which it is paid. To require only that notice be given by December 31 for retirement in the current academic year means that the employer would have very little time to find a replacement for any teacher retiring soon after December 31.[2] Furthermore, under the collective bargaining agreement the "notice increment" is not given to all teachers who give advance notice of their intent to leave, or even to all long-term employees who give advance notice. It is only given to "teacher[s who] qualify for retirement under a bona fide retirement system." Thus the contractual language itself demonstrates that SAD 54 did not regard the "service" of giving notice to be worth $1,535. The Board correctly concluded that plaintiffs had not refuted the obvious inference that the "notice increment" is in fact a retirement bonus.

## II.

### The $1,940 Question: The "Benefit Package" Payments

On its appeal the Board challenges the Superior Court's determination that the "benefit package" payments are "earnable compensation" and must be included in the pension base. These payments were made pursuant to article XIX of the collective bargaining agreement between SAD 54 and its teachers:

### ARTICLE XIX—INSURANCE

A. The [SAD 54] Board agrees to provide for each teacher $1940 in 1986–87 to be used at the teacher's discretion for any or all of the following:
1. MTA Blue Cross/Blue Shield/Major Medical
2. Washington National Insurance
3. Tax Sheltered Annuities
4. Salaries
5. Dental Plan

---

1. The statute has since been amended in a manner not here relevant. *See* P.L.1987, ch. 739, § 2.

2. Dyke retired on February 1. Although he in fact gave notice of his intention to retire the preceding August, the SAD 54 collective bargaining agreement did not require that earlier notice.

6. Supplemental Cancer/Intensive Care Insurance

B. Tax Sheltered Annuities—So as to provide for a nonforfeitable tax-sheltered annuity ... a teacher may contract with the Board for the purchase of an annuity as part of his or her employment compensation. ... The Board agrees to deduct from the teacher's salary the premium....

From the structure of the "benefit package," the Board held that the payments labeled as "salaries" under Option 4 were made "in lieu of fringe benefits" and were therefore "not compensation for actual services rendered" within the meaning of subparagraph B(2) of the statutory definition of "earnable compensation." The absence of any qualitative difference between the options sufficient to justify treating some but not others as "earnable compensation" was illustrated by what happened in practice. At least one plaintiff used the money he received under Option 4 in the "benefit package" to buy precisely the same health insurance he had previously received in kind under Option 1, so that his "change" in benefit options was merely a matter of bookkeeping. Plaintiffs testified candidly before the Board that they understood Option 4 in the SAD 54 collective bargaining agreement was designed to be used by teachers whose retirement was imminent.

A long-established construction of a statute by the agency charged with administering it is entitled to great deference and should not be overturned unless it clearly violates the legislative intent.[3] *See Georgia–Pacific Corp. v. State Tax Assessor,* 562 A.2d 672, 674 (Me.1989). The consistent practice by MSRS of excluding cash payments in lieu of fringe benefits from earnable compensation dates from the 1978 effective date of the present statutory definition, adopted as part of the pension reform legislation of 1975, P.L.1975, ch. 622.[4] There is no basis for any inference that the agency's established construction of the statutory definition departs at all from the legislative intent.

The crucial issue in this case is the meaning of the phrase "salaries and wages" in the statutory definition of "earnable compensation." As the Board in its decision observed, "A standard component of virtually any employment contract in this country is the provision of basic fringe benefits." Such benefits, the Board held, are "separate and distinct from what is ordinarily meant by the terms 'salary or wages,' " even though "such benefits ... are ... a form of compensation ... given in consideration of the services rendered by an employee." Plaintiffs do not contest this distinction between benefits and salaries. They heartily agree that the various health, dental, disability, and other insurance benefit options are not "earnable compensation," but they contend that the basis for deciding whether an employer's payment to an employee is "salary" or a "ben-

---

3. The Board has "responsibility for the proper operation of the retirement system and for making [the Act creating the MSRS] effective" as well as for "formulat[ing] policies and exercis[ing] general supervision under [the Act]." 5 M.R.S.A. § 17103(1) & (2) (1989). In addition, the Board in both rulemaking and adjudicatory proceedings makes the final decision "on all matters pertaining to administration, actuarial assumptions, actuarial recommendations and the reserves and the investments of the retirement system." *Id.* § 17103(7).

4. The construction consistently put by the MSRS on the controlling statute has been codified, effective subsequent to plaintiffs' retirement, after a formal rulemaking proceeding in which the Maine Teachers Association actively participated. As a result the MSRS Average Final Compensation Rule, 94–411 Me. Rules ch. 101, § 2, now provides:

> When calculating a member's average final compensation, earnable compensation shall not include any amounts paid to the member in lieu of fringe benefits or any amounts ... payable because of planned retirement or any other amount paid which is a bonus or stipend that does not represent payment for *services currently being rendered.*

Neither before the Board nor on appeal have plaintiffs disputed the Board's finding of fact that

> the Board of Trustees has consistently interpreted the underlying statute, enacted in 1975, to mean exactly what the rule now expressly states. The Retirement System staff represents that it has also interpreted the statutory definition consistently in cases that have not reached the Board of Trustees. Appellants [Huard and Dyke] offer no evidence to the contrary.

efit" should be whether the payment is made in cash or in kind. They point to the fact that the SAD 54 collective bargaining agreement labels the cash payments under Option 4 as "salaries."

The plain language of the collective bargaining agreement, however, also labels the entire article XIX benefit package as "insurance" and subordinates the "salary" option to that overall purpose and designation. "Salaries" are governed by an entirely separate article, article XIII. Plaintiffs' argument that their "benefit package" payments should not be regarded as cash in lieu of fringe benefits, but rather that their earlier in-kind benefits should be regarded as "fringe benefits in lieu of salary," would prove too much: by that logic, the entire "package" should have been treated as salary all along and plaintiffs would owe substantial retroactive contributions for the years no MSRS payroll deductions were made on account of the employer-paid insurance premiums.

It is not always easy to decide what things are properly characterized as "fringe benefits" or what is the effect of so characterizing them. There is no single universally applicable dividing line between what payments are "wages, earnings, or salary" and what are not. *Cf. Ashby v. Rust Eng'g Co.*, 559 A.2d 774, 775–76 (Me. 1989) (question whether "earnings" include fringe benefits for purpose of calculating workers' compensation award). The statutory definition must be interpreted in light of the objectives of the statute. Here the controlling statutory purpose is to fulfill the "legitimate retirement expectations of employees." *Soucy v. Board of Trustees of Maine State Retirement Sys.*, 456 A.2d 1279, 1281 (Me.1983). What an employee may reasonably expect is consistency over the years in the definition of "earnable compensation" used in administering the Maine State Retirement System. Employees' contributions are based on their current "earnable compensation," their pensions on their peak three-year "earnable compensation." There is an obvious economic reason the legislature chose to use the same term in both contexts. We agree with the Board, therefore, that the "benefit package," which legitimately sheltered a portion of plaintiffs' total compensation from MSRS payroll deductions during the years in which they chose other benefit options, remained outside the scope of "earnable compensation" when plaintiffs chose the cash option.

We are not persuaded by plaintiffs' two arguments to the contrary. First, they contend that the "benefit package" payments should be treated as salary payments because they were made periodically as part of plaintiffs' regular paychecks and made only for so much time as plaintiffs actually worked; thus plaintiff Dyke, who retired in midyear, received only his pro rata share of the $1,940. But traditional fringe benefits such as health insurance are provided in exactly the same manner, that is, over the period worked, except that the cash is paid directly to the insurer-provider rather than to the employee.

Second, plaintiffs argue that the "package" cannot be treated consistently as "fringe benefits" because the express language of the statute provides that "*[a]ny* money paid by an employer under an annuity contract for the future benefit of an employee" is "earnable compensation." 5 M.R.S.A. § 17001(13)(A)(3) (emphasis added). Thus, according to plaintiffs, an SAD 54 teacher could always convert the "benefit package" to "earnable compensation" by electing Option 3 ("Tax Sheltered Annuities") in the last three years of employment, and it would be irrational not to allow him to do the same thing by electing Option 4.

Neither plaintiff elected Option 3. We therefore need not decide whether the "actual services rendered" test of subparagraph B(2) applies to annuity payments, i.e., whether subparagraph A(3) encompasses annuity payments in lieu of fringe benefits, or refers only to annuity payments in lieu of salaries as under section XIX (B) of the collective bargaining agreement, *supra*. Even if plaintiffs, and the Superior Court, were correct that the word "any" in subparagraph A(3) manifests a legislative intent to give additional preferred treatment to "tax sheltered annuities" for teach-

ers by allowing those annuities to be used as a vehicle for "ballooning" the pension base, that fact provides no reason whatever to infer a legislative intent to give similar preferred treatment to cash payments in lieu of fringe benefits.

We therefore agree with the Board's conclusion that the "benefit package" payments are not direct "compensation for actual services rendered" but rather are compensation for fringe benefits foregone. It is only the overall benefit package, not the Option 4 cash payments themselves, that is tied in any way to services rendered. If we were to reject the Board's construction and treat those cash payments as "earnable compensation," logic would compel that we treat all of the other options as "earnable compensation" as well. Such an interpretation might be consistent with the letter of the statute, but adopting that interpretation by judicial fiat would so thoroughly unsettle established reasonable expectations as to frustrate the purpose of the statute.

The entry is:

Judgment modified to affirm the decision of the Board of Trustees in full, and as so modified affirmed.

All concurring.