# FEDERAL TRADE COMMISSION *v.* TICOR TITLE INSURANCE CO. ET AL.

No. 91–72.   Argued January 13, 1992—Decided June 12, 1992

622

KENNEDY, J., delivered the opinion of the Court, in which WHITE, BLACKMUN, STEVENS, SCALIA, and SOUTER, JJ., joined. SCALIA, J., filed a concurring opinion, *post*, p. 640. REHNQUIST, C. J., filed a dissenting opinion, in which O'CONNOR and THOMAS, JJ., joined, *post*, p. 641. O'CON-NOR, J., filed a dissenting opinion, in which THOMAS, J., joined, *post*, p. 646.

*Deputy Solicitor General Wallace* argued the cause for petitioner. With him on the briefs were *Solicitor General Starr, Assistant Attorney General Rill, Robert A. Long, Jr., James M. Spears, Jay C. Shaffer, Ernest J. Isenstadt, Michael E. Antalics,* and *Ann Malester.*

*John C. Christie, Jr.,* argued the cause for respondents. With him on the brief were *Patrick J. Roach, John F. Graybeal,* and *David M. Foster.* *

---

*A brief of *amici curiae* urging reversal was filed for the State of Wisconsin et al. by *James E. Doyle,* Attorney General of Wisconsin, and *Kevin J. O'Connor,* Assistant Attorney General, *J. Joseph Curran, Jr.,* Attorney General of Maryland, and *Robert N. McDonald* and *Ellen S. Cooper,* Assistant Attorneys General, *James H. Evans,* Attorney General of Alabama, *Charles E. Cole,* Attorney General of Alaska, and *James Forbes,* Assistant Attorney General, *Grant Woods,* Attorney General of Arizona, and *Jeri K. Auther,* Assistant Attorney General, *Winston Bryant,* Attorney General of Arkansas, and *Royce Griffin,* Deputy Attorney General, *Charles M. Oberly III,* Attorney General of Delaware, *Robert A. Butterworth,* Attorney General of Florida, *Larry EchoHawk,* Attorney General of Idaho, and *Brett T. DeLange,* Deputy Attorney General, *Bonnie J. Campbell,* Attorney General of Iowa, and *John R. Perkins,* Deputy Attorney General, *Frederic J. Cowan,* Attorney General of Kentucky, and *James*

JUSTICE KENNEDY delivered the opinion of the Court.

The Federal Trade Commission filed an administrative complaint against six of the Nation's largest title insurance

*M. Ringo*, Assistant Attorney General, *William J. Guste, Jr.*, Attorney General of Louisiana, and *Jesse James Marks* and *Anne F. Benoit*, Assistant Attorneys General, *Michael E. Carpenter*, Attorney General of Maine, and *Stephen L. Wessler*, Deputy Attorney General, *Scott Harshbarger*, Attorney General of Massachusetts, and *George K. Weber* and *Thomas M. Alpert*, Assistant Attorneys General, *Frank J. Kelley*, Attorney General of Michigan, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Mike Moore*, Attorney General of Mississippi, *Marc Racicot*, Attorney General of Montana, *Frankie Sue Del Papa*, Attorney General of Nevada, *John P. Arnold*, Attorney General of New Hampshire, *Charles T. Putnam*, Senior Assistant Attorney General, and *Walter L. Maroney*, Assistant Attorney General, *Robert J. Del Tufo*, Attorney General of New Jersey, and *Laurel A. Price*, Deputy Attorney General, *Robert Abrams*, Attorney General of New York, *Jerry Boone*, Solicitor General, and *George W. Sampson* and *Richard Schwartz*, Assistant Attorneys General, *Lacy H. Thornburg*, Attorney General of North Carolina, *James C. Gulick*, Special Deputy Attorney General, and *K. D. Sturgis*, Assistant Attorney General, *Nicholas J. Spaeth*, Attorney General of North Dakota, and *David W. Huey*, Assistant Attorney General, *Lee Fisher*, Attorney General of Ohio, and *Marc B. Bandman*, Assistant Attorney General, *Susan B. Loving*, Attorney General of Oklahoma, and *Jane F. Wheeler*, Assistant Attorney General, *Ernest D. Preate, Jr.*, Attorney General of Pennsylvania, *Thomas L. Welch*, Chief Deputy Attorney General, and *Carl S. Hisiro*, Assistant Chief Deputy Attorney General, *James E. O'Neil*, Attorney General of Rhode Island, and *Edmund F. Murray, Jr.*, Special Assistant Attorney General, *Charles W. Burson*, Attorney General of Tennessee, *John Knox Walkup*, Solicitor General, and *Perry A. Craft*, Deputy Attorney General, *Dan Morales*, Attorney General of Texas, *Will Pryor*, First Assistant Attorney General, *Mary F. Keller*, Deputy Attorney General, and *Mark Tobey*, Assistant Attorney General, *R. Paul Van Dam*, Attorney General of Utah, *Jeffrey L. Amestoy*, Attorney General of Vermont, and *Geoffrey A. Yudien*, Assistant Attorney General, *Mary Sue Terry*, Attorney General of Virginia, *Kenneth O. Eikenberry*, Attorney General of Washington, and *Carol A. Smith*, Assistant Attorney General, *Mario J. Palumbo*, Attorney General of West Virginia, and *Donald L. Darling*, Deputy Attorney General, and *Joseph B. Meyer*, Attorney General of Wyoming.

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Daniel E. Lungren*, Attorney General of California,

companies, alleging horizontal price fixing in their fees for title searches and title examinations. One company settled by consent decree, while five other firms continue to contest the matter. The Commission charged the title companies with violating § 5(a)(1) of the Federal Trade Commission Act, 38 Stat. 719, 15 U. S. C. § 45(a)(1), which prohibits "[u]nfair methods of competition in or affecting commerce." One of the principal defenses the companies assert is state-action immunity from antitrust prosecution, as contemplated in the line of cases beginning with *Parker* v. *Brown*, 317 U. S. 341 (1943). The Commission rejected this defense, *In re Ticor Title Ins. Co.*, 112 F. T. C. 344 (1989), and the firms sought review in the United States Court of Appeals for the Third Circuit. Ruling that state-action immunity was available under the state regulatory schemes in question, the Court of Appeals reversed. 922 F. 2d 1122 (1991). We granted certiorari. 502 U. S. 806 (1991).

I

Title insurance is the business of insuring the record title of real property for persons with some interest in the estate, including owners, occupiers, and lenders. A title insurance policy insures against certain losses or damages sustained by reason of a defect in title not shown on the policy or title report to which it refers. Before issuing a title insurance

*Roderick E. Walston,* Chief Assistant Attorney General, and *Thomas F. Gede,* Special Assistant Attorney General, *Gale A. Norton,* Attorney General of Colorado, *Don Stenberg,* Attorney General of Nebraska, and *Mark W. Barnett,* Attorney General of South Dakota; for the American Insurance Association et al. by *John E. Nolan, Craig A. Berrington, James H. Bradner, Jr., Theresa L. Sorota,* and *Patrick J. McNally;* for Hartford Fire Insurance Co. et al. by *Stephen M. Shapiro, Mark I. Levy, Andrew J. Pincus,* and *Roy T. Englert, Jr.;* and for the National Council on Compensation Insurance by *Jerome A. Hochberg* and *Mark E. Solomons.*

Briefs of *amici curiae* were filed for the American Land Title Association by *Philip H. Rudolph* and *James R. Maher;* and for the Pennsylvania Electric Association by *Jeffrey H. Howard.*

policy, the insurance company or one of its agents performs a title search and examination. The search produces a chronological list of the public documents in the chain of title to the real property. The examination is a critical analysis or interpretation of the condition of title revealed by the documents disclosed through this search.

The title search and examination are major components of the insurance company's services. There are certain variances from State to State and from policy to policy, but a brief summary of the functions performed by the title companies can be given. The insurance companies exclude from coverage defects uncovered during the search; that is, the insurers conduct searches in order to inform the insured and to reduce their own liability by identifying and excluding known risks. The insured is protected from some losses resulting from title defects not discoverable from a search of the public records, such as forgery, missing heirs, previous marriages, impersonation, or confusion in names. They are protected also against errors or mistakes in the search and examination. Negligence need not be proved in order to recover. Title insurance also includes the obligation to defend in the event that an insured is sued by reason of some defect within the scope of the policy's guarantee.

The title insurance industry earned $1.35 billion in gross revenues in 1982, and respondents accounted for 57 percent of that amount. Four of respondents are the nation's largest title insurance companies: Ticor Title Insurance Co., with 16.5 percent of the market; Chicago Title Insurance Co., with 12.8 percent; Lawyers Title Insurance Co., with 12 percent; and SAFECO Title Insurance Co. (now operating under the name Security Union Title Insurance Co.), with 10.3 percent. Stewart Title Guarantee Co., with 5.4 percent of the market, is the country's eighth largest title insurer, with a strong position in the West and Southwest. App. to Pet. for Cert. 145a.

The Commission issued an administrative complaint in 1985. Horizontal price fixing was alleged in these terms:

> "'Respondents have agreed on the prices to be charged for title search and examination services or settlement services through rating bureaus in various states. Examples of states in which one or more of the respondents have fixed prices with other respondents or other competitors for all or part of their search and examination services or settlement services are Arizona, Connecticut, Idaho, Louisiana, Montana, New Jersey, New Mexico, New York, Ohio, Oregon, Pennsylvania, Wisconsin and Wyoming.'" 112 F. T. C., at 346.

The Commission did not challenge the insurers' practice of setting uniform rates for insurance against the risk of loss from defective titles, but only the practice of setting uniform rates for the title search, examination, and settlement, aspects of the business which, the Commission alleges, do not involve insurance.

Before the Administrative Law Judge (ALJ), respondents defended against liability on three related grounds. First, they maintained that the challenged conduct is exempt from antitrust scrutiny under the McCarran-Ferguson Act, 59 Stat. 34, 15 U. S. C. § 1012(b), which confers antitrust immunity over the "business of insurance" to the extent regulated by state law. Second, they argued that their collective ratemaking activities are exempt under the *Noerr-Pennington* doctrine, which places certain "[j]oint efforts to influence public officials" beyond the reach of the antitrust laws. *Mine Workers* v. *Pennington*, 381 U. S. 657, 670 (1965); *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.*, 365 U. S. 127, 136 (1961). Third, respondents contended their activities are entitled to state-action immunity, which permits anticompetitive conduct if authorized and supervised by state officials. See *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445

U. S. 97 (1980); *Parker* v. *Brown,* 317 U. S. 341 (1943). App. to Pet. for Cert. 218a. As to one State, Ohio, respondents contended that the rates for title search, examination, and settlement had not been set by a rating bureau.

Title insurance company rates and practices in 13 States were the subject of the initial complaint. Before the matter was decided by the ALJ, the Commission declined to pursue its complaint with regard to fees in five of these States: Louisiana, New Mexico, New York, Oregon, and Wyoming. Upon the recommendation of the ALJ, the Commission did not pursue its complaint with regard to fees in two additional States, Idaho and Ohio. This left six States in which the Commission found antitrust violations, but in two of these States, New Jersey and Pennsylvania, the Commission conceded the issue on which certiorari was sought here, so the regulatory regimes in these two States are not before us. Four States remain in which violations were alleged: Connecticut, Wisconsin, Arizona, and Montana.

The ALJ held that the rates for search and examination services had been fixed in these four States. For reasons we need not pause to examine, the ALJ rejected the McCarran-Ferguson and *Noerr-Pennington* defenses. The ALJ then turned his attention to the question of state-action immunity. A summary of the ALJ's extensive findings on this point is necessary for a full understanding of the decisions reached at each level of the proceedings in the case.

Rating bureaus are private entities organized by title insurance companies to establish uniform rates for their members. The ALJ found no evidence that the collective setting of title insurance rates through rating bureaus is a way of pooling risk information. Indeed, he found no evidence that any title insurer sets rates according to actuarial loss experience. Instead, the ALJ found that the usual practice is for rating bureaus to set rates according to profitability studies that focus on the costs of conducting searches and examinations. Uniform rates are set notwithstanding differences in

efficiencies and costs among individual members. App. to Pet. for Cert. 183a–184a.

The ALJ described the regulatory regimes for title insurance rates in the four States still at issue. In each one, the title insurance rating bureau was licensed by the State and authorized to establish joint rates for its members. Each of the four States used what has come to be called a "negative option" system to approve rate filings by the bureaus. Under a negative option system, the rating bureau filed rates for title searches and title examinations with the state insurance office. The rates became effective unless the State rejected them within a specified period, such as 30 days. Although the negative option system provided a theoretical mechanism for substantive review, the ALJ determined, after making detailed findings regarding the operation of each regulatory regime, that the rate filings were subject to minimal scrutiny by state regulators.

In Connecticut the State Insurance Department has the authority to audit the rating bureau and hold hearings regarding rates, but it has not done so. The Connecticut rating bureau filed only two major rate increases, in 1966 and in 1981. The circumstances behind the 1966 rate increase are somewhat obscure. The ALJ found that the Insurance Department asked the rating bureau to submit additional information justifying the increase, and later approved the rate increase although there is no evidence the additional information was provided. In 1981 the Connecticut rating bureau filed for a 20 percent rate increase. The factual background for this rate increase is better developed though the testimony was somewhat inconsistent. A state insurance official testified that he reviewed the rate increase with care and discussed various components of the increase with the rating bureau. The same official testified, however, that he lacked the authority to question certain expense data he considered quite high. *Id.,* at 189a–195a.

In Wisconsin the State Insurance Commissioner is required to examine the rating bureau at regular intervals and authorized to reject rates through a process of hearings. Neither has been done. The Wisconsin rating bureau made major rate filings in 1971, 1981, and 1982. The 1971 rate filing was approved in 1971 although supporting justification, which had been requested by the State Insurance Commissioner, was not provided until 1978. The 1981 rate filing requested an 11 percent rate increase. The increase was approved after the office of the Insurance Commissioner checked the supporting data for accuracy. No one in the agency inquired into insurer expenses, though an official testified that substantive scrutiny would not be possible without that inquiry. The 1982 rate increase received but a cursory reading at the office of the Insurance Commissioner. The supporting materials were not checked for accuracy, though in the absence of an objection by the agency, the rate increase went into effect. *Id.*, at 196a–200a.

In Arizona the Insurance Director was required to examine the rating bureau at least once every five years. It was not done. In 1980 the State Insurance Department announced a comprehensive investigation of the rating bureau. It was not conducted. The rating bureau spent most of its time justifying its escrow rates. Following conclusion in 1981 of a federal civil suit challenging the joint fixing of escrow rates, the rating bureau went out of business without having made any major rate filings, though it had proposed minor rate adjustments. *Id.*, at 200a–205a.

In Montana the rating bureau made its only major rate filing in 1983. In connection with it, a representative of the rating bureau met with officials of the State Insurance Department. He was told that the filed rates could go into immediate effect though further profit data would have to be provided. The ALJ found no evidence that the additional data were furnished. *Id.*, at 211a–214a.

To complete the background, the ALJ observed that none of the rating bureaus are now active. The respondents abandoned them between 1981 and 1985 in response to numerous private treble-damages suits, so by the time the Commission filed its formal complaint in 1985, the rating bureaus had been dismantled. *Id.*, at 195a, 200a, 205a, 208a. The ALJ held that the case is not moot, though, because nothing would preclude respondents from resuming the conduct challenged by the Commission. *Id.*, at 246a–247a. See *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 632–633 (1953).

These factual determinations established, the ALJ addressed the two-part test that must be satisfied for state-action immunity under the antitrust laws, the test we set out in *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980). A state law or regulatory scheme cannot be the basis for antitrust immunity unless, first, the State has articulated a clear and affirmative policy to allow the anticompetitive conduct, and second, the State provides active supervision of anticompetitive conduct undertaken by private actors. *Id.*, at 105. The Commission having conceded that the first part of the test was satisfied in the four States still at issue, the immunity question, beginning with the hearings before the ALJ and in all later proceedings, has turned upon the proper interpretation and application of *Midcal*'s active supervision requirement. The ALJ found the active supervision test was met in Arizona and Montana but not in Connecticut or Wisconsin. App. to Pet. for Cert. 248a.

On review of the ALJ's decision, the Commission held that none of the four States had conducted sufficient supervision, so that the title companies were not entitled to immunity in any of those jurisdictions. *Id.*, at 47a. The Court of Appeals for the Third Circuit disagreed with the Commission, adopting the approach of the First Circuit in *New England Motor Rate Bureau, Inc.* v. *FTC*, 908 F. 2d 1064 (1990), which

had held that the existence of a state regulatory program, if staffed, funded, and empowered by law, satisfied the requirement of active supervision. *Id.*, at 1071. Under this standard, the Court of Appeals for the Third Circuit ruled that the active state supervision requirement was met in all four States and held that the respondents' conduct was entitled to state-action immunity in each of them. 922 F. 2d, at 1140.

We granted certiorari to consider two questions: First, whether the Third Circuit was correct in its statement of the law and in its application of law to fact, and second, whether the Third Circuit exceeded its authority by departing from the factual findings entered by the ALJ and adopted by the Commission. Before this Court, the parties have confined their briefing on the first of these questions to the regulatory regimes of Wisconsin and Montana, and focused on the regulatory regimes of Connecticut and Arizona in briefing on the second question. We now reverse the Court of Appeals under the first question and remand for further proceedings under the second.

## II

The preservation of the free market and of a system of free enterprise without price fixing or cartels is essential to economic freedom. *United States* v. *Topco Associates, Inc.*, 405 U. S. 596, 610 (1972). A national policy of such a pervasive and fundamental character is an essential part of the economic and legal system within which the separate States administer their own laws for the protection and advancement of their people. Continued enforcement of the national antitrust policy grants the States more freedom, not less, in deciding whether to subject discrete parts of the economy to additional regulations and controls. Against this background, in *Parker* v. *Brown*, 317 U. S. 341 (1943), we upheld a state-supervised, market sharing scheme against a Sherman Act challenge. We announced the doctrine that federal antitrust laws are subject to supersession by state regula-

tory programs. Our decision was grounded in principles of federalism. *Id.*, at 350–352.

The principle of freedom of action for the States, adopted to foster and preserve the federal system, explains the later evolution and application of the *Parker* doctrine in our decisions in *Midcal, supra*, and *Patrick* v. *Burget*, 486 U. S. 94 (1988). In *Midcal* we invalidated a California statute forbidding licensees in the wine trade to sell below prices set by the producer. There we announced the two-part test applicable to instances where private parties participate in a price-fixing regime. "First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; second, the policy must be actively supervised by the State itself." 445 U. S., at 105 (internal quotation marks omitted). *Midcal* confirms that while a State may not confer antitrust immunity on private persons by fiat, it may displace competition with active state supervision if the displacement is both intended by the State and implemented in its specific details. Actual state involvement, not deference to private price-fixing arrangements under the general auspices of state law, is the precondition for immunity from federal law. Immunity is conferred out of respect for ongoing regulation by the State, not out of respect for the economics of price restraint. In *Midcal* we found that the intent to restrain prices was expressed with sufficient precision so that the first part of the test was met, but that the absence of state participation in the mechanics of the price posting was so apparent that the requirement of active supervision had not been met. *Ibid.*

The rationale was further elaborated in *Patrick* v. *Burget*. In *Patrick* it had been alleged that private physicians participated in the State's peer review system in order to injure or destroy competition by denying hospital privileges to a physician who had begun a competing clinic. We referred to the purpose of preserving the State's own administrative

policies, as distinct from allowing private parties to foreclose competition, in the following passage:

> "The active supervision requirement stems from the recognition that where a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State. . . . The requirement is designed to ensure that the state-action doctrine will shelter only the particular anticompetitive acts of private parties that, in the judgment of the State, actually further state regulatory policies. To accomplish this purpose, the active supervision requirement mandates that the State exercise ultimate control over the challenged anticompetitive conduct. . . . The mere presence of some state involvement or monitoring does not suffice. . . . The active supervision prong of the *Midcal* test requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy. Absent such a program of supervision, there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests." 486 U. S., at 100–101 (internal quotation marks and citations omitted).

Because the particular anticompetitive conduct at issue in *Patrick* had not been supervised by governmental actors, we decided that the actions of the peer review committee were not entitled to state-action immunity. *Id.*, at 106.

Our decisions make clear that the purpose of the active supervision inquiry is not to determine whether the State has met some normative standard, such as efficiency, in its regulatory practices. Its purpose is to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not

simply by agreement among private parties. Much as in causation inquiries, the analysis asks whether the State has played a substantial role in determining the specifics of the economic policy. The question is not how well state regulation works but whether the anticompetitive scheme is the State's own.

Although the point bears but brief mention, we observe that our prior cases considered state-action immunity against actions brought under the Sherman Act, and this case arises under the Federal Trade Commission Act. The Commission has argued at other times that state-action immunity does not apply to Commission action under § 5 of the Federal Trade Commission Act, 15 U. S. C. § 45. See U. S. Bureau of Consumer Protection, Staff Report to the Federal Trade Commission on Prescription Drug Price Disclosures, Chs. VI(B) and (C) (1975); see also Note, The State Action Exemption and Antitrust Enforcement under the Federal Trade Commission Act, 89 Harv. L. Rev. 715 (1976). A leading treatise has expressed its skepticism of this view. See 1 P. Areeda & D. Turner, Antitrust Law ¶ 218 (1978). We need not determine whether the antitrust statutes can be distinguished on this basis, because the Commission does not assert any superior pre-emption authority in the instant matter. We apply our prior cases to the one before us.

Respondents contend that principles of federalism justify a broad interpretation of state-action immunity, but there is a powerful refutation of their viewpoint in the briefs that were filed in this case. The State of Wisconsin, joined by Montana and 34 other States, has filed a brief as *amici curiae* on the precise point. These States deny that respondents' broad immunity rule would serve the States' best interests. We are in agreement with the *amici* submission.

If the States must act in the shadow of state-action immunity whenever they enter the realm of economic regulation, then our doctrine will impede their freedom of action, not advance it. The fact of the matter is that the States regu-

late their economies in many ways not inconsistent with the antitrust laws. For example, Oregon may provide for peer review by its physicians without approving anticompetitive conduct by them. See *Patrick*, 486 U. S., at 105. Or Michigan may regulate its public utilities without authorizing monopolization in the market for electric light bulbs. See *Cantor* v. *Detroit Edison Co.*, 428 U. S. 579, 596 (1976). So we have held that state-action immunity is disfavored, much as are repeals by implication. *Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389, 398–399 (1978). By adhering in most cases to fundamental and accepted assumptions about the benefits of competition within the framework of the antitrust laws, we increase the States' regulatory flexibility.

States must accept political responsibility for actions they intend to undertake. It is quite a different matter, however, for federal law to compel a result that the States do not intend but for which they are held to account. Federalism serves to assign political responsibility, not to obscure it. Neither federalism nor political responsibility is well served by a rule that essential national policies are displaced by state regulations intended to achieve more limited ends. For States which do choose to displace the free market with regulation, our insistence on real compliance with both parts of the *Midcal* test will serve to make clear that the State is responsible for the price fixing it has sanctioned and undertaken to control.

Respondents contend that these concerns are better addressed by the requirement that the States articulate a clear policy to displace the antitrust laws with their own forms of economic regulation. This contention misapprehends the close relation between *Midcal*'s two elements. Both are directed at ensuring that particular anticompetitive mechanisms operate because of a deliberate and intended state policy. See *Patrick*, *supra*, at 100. In the usual case, *Midcal*'s requirement that the State articulate a clear policy shows little more than that the State has not acted through inad-

vertence; it cannot alone ensure, as required by our precedents, that particular anticompetitive conduct has been approved by the State. It seems plain, moreover, in light of the *amici curiae* brief to which we have referred, that sole reliance on the requirement of clear articulation will not allow the regulatory flexibility that these States deem necessary. For States whose object it is to benefit their citizens through regulation, a broad doctrine of state-action immunity may serve as nothing more than an attractive nuisance in the economic sphere. To oppose these pressures, sole reliance on the requirement of clear articulation could become a rather meaningless formal constraint.

## III

In the case before us, the Court of Appeals relied upon a formulation of the active supervision requirement articulated by the First Circuit:

> " 'Where . . . the state's program is in place, is staffed and funded, grants to the state officials ample power and the duty to regulate pursuant to declared standards of state policy, is enforceable in the state's courts, and demonstrates some basic level of activity directed towards seeing that the private actors carry out the state's policy and not simply their own policy, more need not be established.' " 922 F. 2d, at 1136, quoting *New England Motor Rate Bureau, Inc.* v. *FTC,* 908 F. 2d, at 1071.

Based on this standard, the Third Circuit ruled that the active supervision requirement was met in all four States, and held that the respondents' conduct was entitled to state-action immunity from antitrust liability. 922 F. 2d, at 1140.

While in theory the standard articulated by the First Circuit might be applied in a manner consistent with our precedents, it seems to us insufficient to establish the requisite level of active supervision. The criteria set forth by the First Circuit may have some relevance as the beginning

point of the active state supervision inquiry, but the analysis cannot end there. Where prices or rates are set as an initial matter by private parties, subject only to a veto if the State chooses to exercise it, the party claiming the immunity must show that state officials have undertaken the necessary steps to determine the specifics of the price-fixing or ratesetting scheme. The mere potential for state supervision is not an adequate substitute for a decision by the State. Under these standards, we must conclude that there was no active supervision in either Wisconsin or Montana.

Respondents point out that in Wisconsin and Montana the rating bureaus filed rates with state agencies and that in both States the so-called negative option rule prevailed. The rates became effective unless they were rejected within a set time. It is said that as a matter of law in those States inaction signified substantive approval. This proposition cannot be reconciled, however, with the detailed findings, entered by the ALJ and adopted by the Commission, which demonstrate that the potential for state supervision was not realized in fact. The ALJ found, and the Commission agreed, that at most the rate filings were checked for mathematical accuracy. Some were unchecked altogether. In Montana, a rate filing became effective despite the failure of the rating bureau to provide additional requested information. In Wisconsin, additional information was provided after a lapse of seven years, during which time the rate filing remained in effect. These findings are fatal to respondents' attempts to portray the state regulatory regimes as providing the necessary component of active supervision. The findings demonstrate that, whatever the potential for state regulatory review in Wisconsin and Montana, active state supervision did not occur. In the absence of active supervision in fact, there can be no state-action immunity for what were otherwise private price-fixing arrangements. And as in *Patrick*, the availability of state judicial review could not fill the void. Because of the state agencies' limited role and

participation, state judicial review was likewise limited. See *Patrick*, 486 U. S., at 103–105.

Our decision in *Southern Motor Carriers Rate Conference, Inc.* v. *United States*, 471 U. S. 48 (1985), though it too involved a negative option regime, is not to the contrary. The question there was whether the first part of the *Midcal* test was met, the Government's contention being that a pricing policy is not an articulated one unless the practice is compelled. We rejected that assertion and undertook no real examination of the active supervision aspect of the case, for the Government conceded that the second part of the test had been met. *Id.*, at 62, 66. The concession was against the background of a District Court determination that, although submitted rates could go into effect without further state activity, the State had ordered and held ratemaking hearings on a consistent basis, using the industry submissions as the beginning point. See *United States* v. *Southern Motor Carriers Rate Conference, Inc.*, 467 F. Supp. 471, 476–477 (ND Ga. 1979). In the case before us, of course, the Commission concedes the first part of the *Midcal* requirement and litigates the second; and there is no finding of substantial state participation in the ratesetting scheme.

This case involves horizontal price fixing under a vague *imprimatur* in form and agency inaction in fact. No antitrust offense is more pernicious than price fixing. *FTC* v. *Superior Court Trial Lawyers Assn.*, 493 U. S. 411, 434, n. 16 (1990). In this context, we decline to formulate a rule that would lead to a finding of active state supervision where in fact there was none. Our decision should be read in light of the gravity of the antitrust offense, the involvement of private actors throughout, and the clear absence of state supervision. We do not imply that some particular form of state or local regulation is required to achieve ends other than the establishment of uniform prices. Cf. *Columbia* v. *Omni Outdoor Advertising, Inc.*, 499 U. S. 365 (1991) (city billboard zoning ordinance entitled to state-action immunity). We do

not have before us a case in which governmental actors made unilateral decisions without participation by private actors. Cf. *Fisher* v. *Berkeley*, 475 U. S. 260 (1986) (private actors not liable without private action). And we do not here call into question a regulatory regime in which sampling techniques or a specified rate of return allow state regulators to provide comprehensive supervision without complete control, or in which there was an infrequent lapse of state supervision. Cf. *324 Liquor Corp.* v. *Duffy*, 479 U. S. 335, 344, n. 6 (1987) (a statute specifying the margin between wholesale and retail prices may satisfy the active supervision requirement). In the circumstances of this case, however, we conclude that the acts of respondents in the States of Montana and Wisconsin are not immune from antitrust liability.

## IV

In granting certiorari we undertook to review the further contention by the Commission that the Court of Appeals was incorrect in disregarding the Commission's findings as to the extent of state supervision. The parties have focused their briefing on this question on the regulatory schemes of Connecticut and Arizona. We think the Court of Appeals should have the opportunity to reexamine its determinations with respect to these latter two States in light of the views we have expressed.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring.

The Court's standard is in my view faithful to what our cases have said about "active supervision." On the other hand, I think THE CHIEF JUSTICE and JUSTICE O'CONNOR are correct that this standard will be a fertile source of uncertainty and (hence) litigation, and will produce total aban-

donment of some state programs because private individuals will not take the chance of participating in them. That is true, moreover, not just in the "negative option" context, but even in a context such as that involved in *Patrick* v. *Burget*, 486 U. S. 94 (1988): Private physicians invited to participate in a state-supervised hospital peer review system may not know until after their participation has occurred (and indeed until after their trial has been completed) whether the State's supervision will be "active" enough.

I am willing to accept these consequences because I see no alternative within the constraints of our "active supervision" doctrine, which has not been challenged here; and because I am skeptical about the *Parker* v. *Brown*, 317 U. S. 341 (1943), exemption for state-programmed private collusion in the first place.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR and JUSTICE THOMAS join, dissenting.

The Court holds today that to satisfy the "active supervision" requirement of state-action immunity from antitrust liability, private parties acting pursuant to a regulatory scheme enacted by a state legislature must prove that "the State has played a substantial role in determining the specifics of the economic policy." *Ante,* at 635. Because this standard is neither supported by our prior precedent nor sound as a matter of policy, I dissent.

Immunity from antitrust liability under the state-action doctrine was first established in *Parker* v. *Brown*, 317 U. S. 341 (1943). As noted by the majority, in *Parker* we relied on principles of federalism in concluding that the Sherman Act did not apply to state officials administering a regulatory program enacted by the state legislature. We concluded that state action is exempt from antitrust liability, because in the Sherman Act Congress evidences no intent to "restrain state action or official action directed by a state." *Id.,*

at 351.[1]  "The *Parker* decision was premised on the assumption that Congress, in enacting the Sherman Act, did not intend to compromise the States' ability to regulate their domestic commerce."  *Southern Motor Carriers Rate Conference, Inc.* v. *United States,* 471 U. S. 48, 56 (1985) (footnote omitted).

We developed our present analysis for state-action immunity for private actors in *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.,* 445 U. S. 97 (1980).  We held in *Midcal* that our prior precedent had granted state-action immunity from antitrust liability to conduct by private actors where a program was "clearly articulated and affirmatively expressed as state policy [and] the policy [was] actively supervised by the State itself."  *Id.,* at 105 (internal quotation marks and citation omitted).  In *Midcal,* we found the active supervision requirement was not met because under the California statute at issue, which required liquor retailers to charge a certain percentage above a price "posted" by area wholesalers, "[t]he State has no direct control over wine prices, and it does not review the reasonableness of the prices set by wine dealers."  *Id.,* at 100.  We noted that the state-action defense does not allow the States to authorize what is nothing more than private price fixing.  *Id.,* at 105.

In each instance since *Midcal* in which we have concluded that the active supervision requirement for state-action immunity was not met, the state regulators lacked authority, under state law, to review or reject the rates or action taken

---

[1] The Court states that "[c]ontinued enforcement of the national antitrust policy grants the States more freedom, not less, in deciding whether to subject discrete parts of the economy to additional regulations and controls," *ante,* at 632.  However, in *Parker,* we held that the Sherman Act simply does not apply to conduct regulated by the State.  The enforcement of the national antitrust policy, as embodied in the antitrust laws, may grant individuals more freedom to compete in our free market system, but it does not implicate the freedom of the States in deciding whether to regulate.

by the private actors facing antitrust liability.[2]   Our most recent formulation of the "active supervision" requirement was announced in *Patrick* v. *Burget*, 486 U. S. 94 (1988), where we concluded that to satisfy the "active supervision" requirement, "state officials [must] have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." *Id.*, at 101.  · Until today, therefore, we have never had occasion to determine whether a state regulatory program which gave state officials authority—"power"—to review and regulate prices or conduct, might still fail to meet the requirement for active state supervision because the State's regulation was not sufficiently detailed or rigorous.

Addressing this question, the Court of Appeals in this case used the following analysis:

> " 'Where, as here, the state's program is in place, is staffed and funded, grants to the state officials ample power and the duty to regulate pursuant to declared standards of state policy, is enforceable in the state's courts, and demonstrates some basic level of activity directed towards seeing that the private actors carry out the state's policy and not simply their own policy, more need not be established.' "   922 F. 2d 1122, 1136 (CA3 1991), quoting *New England Motor Rate Bureau, Inc.* v. *FTC*, 908 F. 2d 1064, 1071 (CA1 1990).

The Court likens this test to doing away all together with the active supervision requirement for immunity based on state action.   But the test used by the Court of Appeals is

---

[2] In *324 Liquor Corp.* v. *Duffy*, 479 U. S. 335 (1987), we held that a New York statute failed to shelter private actors from antitrust liability because the state legislation required retailers to charge 112% of the price "posted" by wholesalers.   The New York statute, like the California statute at issue in *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980), gave no power to the state agency to review or establish the reasonableness of the price schedules "posted" by the wholesalers.   *324 Liquor, supra*, at 345.

much more closely attuned to our "have and exercise power" formulation in *Patrick* v. *Burget* than is the rule adopted by the Court today. The Court simply does not say just how active a State's regulators must be before the "active supervision" requirement will be satisfied. The only guidance it gives is that the inquiry should be one akin to causation in a negligence case; does the State play "a substantial role in determining the specifics of the economic policy." *Ante,* at 635. Any other formulation, we are told, will remove the active supervision requirement altogether as a practical matter.

I do not believe this to be the case.[3] In the States at issue here, the particular conduct was approved by a state agency. The agency manifested this approval by raising no objection to a required rate filing by the entity subject to regulation. This is quite consistent with our statement that the active supervision requirement serves mainly an "evidentiary function" as "one way of ensuring that the actor is engaging in the challenged conduct pursuant to state policy." *Hallie* v. *Eau Claire,* 471 U. S. 34, 46 (1985).

The Court insists that its newly required "active supervision" will "increase the States' regulatory flexibility." *Ante,* at 636. But if private actors who participate, through a joint rate filing, in a State's "negative option" regulatory scheme may be liable for treble damages if they cannot prove that the State approved the specifics of a filing, the Court makes it highly unlikely that private actors will choose to participate in such a joint filing. This in turn *lessens* the States' regulatory flexibility, because as we have noted before, joint rate filings can improve the regulatory process by ensuring that the state agency has fewer filings to consider, allowing more resources to be expended on each filing.

---

[3] The state regulatory programs in *Midcal, supra, Patrick* v. *Burget,* 486 U. S. 94 (1988), and *324 Liquor, supra,* would all fail to provide immunity for lack of active supervision under the test adopted by the Court of Appeals.

*Southern Motor Carriers Rate Conference, Inc.* v. *United States, supra,* at 51. The view advanced by the Court of Appeals does not sanction price fixing in areas regulated by a State "not inconsistent with the antitrust laws." *Ante,* at 636. A State must establish, staff, and fund a program to approve jointly set rates or prices in order for any activity undertaken by private individuals under that program to be immune under the antitrust laws.[4]

The Court rejects the test adopted by the Court of Appeals, stating that it cannot be the end of the inquiry. Instead, the party seeking immunity must "show that state officials have undertaken the necessary steps to determine the specifics of the price-fixing or ratesetting scheme." *Ante,* at 638.[5] Such an inquiry necessarily puts the federal court in the position of determining the efficacy of a particular State's regulatory scheme, in order to determine whether the State has met the "requisite level of active supervision." *Ante,* at 637. The Court maintains that the proper state-action inquiry does not determine whether a State has met some "normative standard" in its regulatory practices. *Ante,* at 634. But the Court's focus on the actions taken by state regulators, *i. e.,* the way the State regulates, necessarily requires a judgment as to whether the State is sufficiently active—surely a normative judgment.

---

[4] In neither of the examples cited by the majority as instances of state regulation not intended to authorize anticompetitive conduct would application of a less detailed active supervision test change the result. In *Patrick* v. *Burget, supra,* we concluded there was no immunity because the State did not have the authority to review the anticompetitive action undertaken by the peer review committee; in *Cantor* v. *Detroit Edison Co.,* 428 U. S. 579 (1976), it is unlikely that the clear articulation requirement under our current jurisprudence would be met with respect to the market for light bulbs.

[5] It is not clear, from the Court's formulation, whether this is a separate test applicable only to negative option regulatory schemes, or whether it applies more generally to issues of immunity under the state-action doctrine.

The Court of Appeals found—properly, in my view—that while the States at issue here did not regulate respondents' rates with the vigor petitioner would have liked, the States' supervision of respondents' conduct was active enough so as to provide for immunity from antitrust liability. The Court of Appeals, having concluded that the Federal Trade Commission applied an incorrect legal standard, reviewed the facts found by the Commission in light of the correct standard and reached a different conclusion. This does not constitute a rejection of the Commission's factual findings.

I would therefore affirm the judgment below.

JUSTICE O'CONNOR, with whom JUSTICE THOMAS joins, dissenting.

Notwithstanding its assertions to the contrary, the Court has diminished the States' regulatory flexibility by creating an impossible situation for those subject to state regulation. Even when a State has a "clearly articulated policy" authorizing anticompetitive behavior—which the Federal Trade Commission concedes was the case here—and even when the State establishes a system to supervise the implementation of that policy, the majority holds that a federal court may later find that the State's supervision was not sufficiently "substantial" in its "specifics" to insulate the anticompetitive behavior from antitrust liability. *Ante*, at 635. Given the threat of treble damages, regulated entities that have the option of heeding the State's anticompetitive policy would be foolhardy to do so; those that are compelled to comply are less fortunate. The practical effect of today's decision will likely be to eliminate so-called "negative option" regulation from the universe of schemes available to a State that seeks to regulate without exposing certain conduct to federal antitrust liability.

The Court does not dispute that each of the States at issue in this case *could have* supervised respondents' joint ratemaking; rather, it argues that "the potential for state super-

vision was not realized in fact." *Ante,* at 638. Such an after-the-fact evaluation of a State's exercise of its supervisory powers is extremely unfair to regulated parties. Liability under the antitrust laws should not turn on how enthusiastically a state official carried out his or her statutory duties. The regulated entity has no control over the regulator, and very likely will have no idea as to the degree of scrutiny that its filings may receive. Thus, a party could engage in exactly the same conduct in two States, each of which had exactly the same policy of allowing anticompetitive behavior and exactly the same regulatory structure, and discover afterward that its actions in one State were immune from antitrust prosecution, but that its actions in the other resulted in treble-damages liability.

Moreover, even if a regulated entity could assure itself that the State will undertake to actively supervise its rate filings, the majority does not offer any guidance as to what level of supervision will suffice. It declares only that the State must "pla[y] a substantial role in determining the specifics of the economic policy." *Ante,* at 635. That standard is not only ambiguous, but also runs the risk of being counterproductive. The more reasonable a filed rate, the less likely that a State will have to play any role other than simply reviewing the rate for compliance with statutory criteria. Such a vague and retrospective standard, combined with the threat of treble damages if that standard is not satisfied, makes "negative option" regulation an unattractive option for both States and the parties they regulate.

Finally, it is important to remember that antitrust actions can be brought by private parties as well as by government prosecutors. The resources of state regulators are strained enough without adding the extra burden of asking them to serve as witnesses in civil litigation and respond to allegations that they did not do their job.

For these reasons, as well as those given by THE CHIEF JUSTICE, I dissent.