**1346**

Jeanine SLAGLE, for herself
and all others similarly
situated, Plaintiff,

v.

ITT HARTFORD INSURANCE
GROUP, et al., Defendants.

No. TCA 94–40563–WS.

United States District Court,
N.D. Florida,
Tallahassee Division.

Sept. 11, 1995.

Herbert T. Schwartz, Sullins, Johnston, Rohrbach & Magers, Houston, TX, for Jeanine Slagle.

Charles M. Johnston, Taylor, Day & Rio, Jacksonville, FL, William M. Hannay, Pro Hac Vice, Michael Neil Lloyd, Pro Hac Vice, Schiff, Hardin & White, Chicago, IL, Mark Kenneth Delegal, Vincent J. Rio, III, Taylor, Day & Rio, Tallahassee, FL, for State Farm Fire & Casualty Company.

Brian S. Duffy, McConnaughhay, Roland, Maida & Cherr, Tallahassee, FL, for Allstate Insurance Company.

C. Alan Lawson, Steel, Hector & Davis, Tallahassee, FL, Mark F. Horning, Pro Hac Vice, Steptoe & Johnson, Washington, DC, for Aetna Casualty & Surety Company.

Christine Rieger Milton, Mahoney, Adams & Criser, P.A., Jacksonville, FL, Daniel C. Brown, Bill L. Bryant, Jr., Katz, Kutter, Haigler, Alderman, Davis, Marks & Bryant, Tallahassee, FL, for Florida Windstorm Underwriting Association.

Fred Wallace Pope, Jr., Clearwater, FL, for The Hartford Company.

### ORDER ADOPTING REPORT AND RECOMMENDATION

STAFFORD, District Judge.

Before the court is the magistrate judge's report and recommendation dated June 9, 1995 (document 51). The magistrate judge recommends that the court grant defendants' motion for judgment on the pleadings (document 27).

Having considered the magistrate judge's report and recommendation (document 51) and plaintiff's objections thereto (document 55), the court determines that the report and recommendation should be adopted.

Accordingly it is ORDERED:

1. The magistrate judge's report and recommendation (document 51) is hereby adopted and incorporated by reference into this order of the court.

2. Defendants' motion for judgment on the pleadings (document 27) is GRANTED.

3. The clerk shall enter judgment in favor of the defendants and against the plaintiff.

DONE AND ORDERED.

### REPORT AND RECOMMENDATION

SHERRILL, United States Magistrate Judge.

Defendants have moved for judgment on the pleadings. Doc. 28. Defendants contend that Plaintiff's claims are barred by the McCarran–Ferguson Act and are not exempt under § 3(b) of that Act, which exempts boycotts. Defendants also contend that the relief sought is barred by the *Keogh* doctrine enunciated in *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). Plaintiff filed a response, doc. 38, and Defendants replied, doc. 39.

The motion was referred for a report and recommendation by Judge Stafford. Docs. 43 and 46. Oral argument was held on June 6, 1995. The motion should be granted as to the first argument. If this recommendation is adopted, the court need not address the *Keogh* defense.

■ On a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c), all matters pleaded in the complaint must be accepted as true. *Swerdloff v. Miami National Bank*, 584 F.2d 54, 57 (5th Cir.1979). This report and recommendation assumes the truth of the allegations of the complaint. Materials outside of the complaint have not been considered.

### I. The allegations of the complaint

Plaintiff explained in her response to the motion: "The Complaint sets forth, with clarity, the existence of a boycott, condemned under § 3(b) of the McCarran–Ferguson Act, that was made possible only through the defendants' cartelization of what properly should be a competitive market." Doc. 38, p. 4. This is an accurate and concise statement of Plaintiff's claim.

The complaint alleges that this suit is brought pursuant to Section One of the Sherman Act, 15 U.S.C. § 1, and Section Four of the Clayton Act, 15 U.S.C. § 15. Doc. 1, para. 1. Plaintiff, Jeanine Slagle, is a consumer of windstorm insurance as an owner of property in Florida. *Id.*, para. 4. Defendants are alleged to be members of the Florida Windstorm Underwriting Association (FWUA) and are insurance companies licensed to transact insurance business in Florida. *Id.*, para. 2.

The FWUA is alleged to have been organized in 1970 under the enabling authority of Chapter 70–234, Laws of Florida, codified as Fla.Stat. § 627.351(2) (1993). The FWUA is an association comprised of insurers who participate in profits and losses on a proportionate basis. It is also a joint underwriting association, funded and governed by the defendants. *Id.*, para. 3. *See also* Fla.Stat. § 627.351(2)(b)2.

As a matter of law it is noted that the FWUA is an insurer of last resort which insures windstorm risk in the coastal areas of Florida by joint underwriting for consumers unable to obtain such insurance by "ordinary methods." Fla.Stat. § 627.351(2)(a) and (b); *American Insurance Ass'n v. Florida Dept. of Insurance*, 646 So.2d 784, 785 (Fla. 1st DCA 1994), *rev. dismissed*, 651 So.2d 1193 (Fla.1995). It is mandated by state law that Defendants participate in the FWUA. *American Insurance Ass'n*, 646 So.2d at 785. Further, state law provides that the Department of Insurance may regulate the rates

charged by the FWUA. Fla.Stat. § 627.351(2)(a).

Defendants are generally alleged to have engaged in concerted anticompetitive conduct by "fixing, pegging or stabilizing of insurance premiums and prices among ostensible competitors through horizontal price fixing and unlawful allocation of markets, customers and territories and the establishment and agreement upon a boycott." *Id.*, para. 7. It is further alleged that:

> The unlawful horizontal agreements alleged herein include effectuating such agreements through various subterfuges, shams and corporate manipulations of reinsurance entities owned entirely, or in part, and dominated by the defendant members of the FWUA, by the unlawful exchange of competitive information to cause the market for windstorm insurance in the affected coastal regions to be noncompetitive, by meetings at which windstorm insurance rates were fixed and agreed upon by formulae for pegging or stabilizing such rates, and by a boycott (a concerted refusal to deal) imposed against the class.

*Id.*

Plaintiff further alleges that these activities are not exempt from the antitrust laws as the "business of insurance" because "[t]he unlawful concerted conduct herein alleged do not [sic] have the effect of spreading or transferring policy holder risk." *Id.*, para. 13. It is alleged that Defendants had as a purpose the elimination of competition in the writing of windstorm insurance by stabilizing windstorm insurance rates at artificially high, noncompetitive amounts not reasonably required by actuarial calculations. *Id.* By elimination of competition, it is alleged Defendants unlawfully allocate consumers among themselves. *Id.* It is alleged that these acts are not immune from antitrust laws because not an integral part of the policy relationship between the insured and the insurer. *Id.*, para. 14.

Plaintiff further alleges that Defendants have engaged in a boycott "by agreeing among themselves that windstorm policies in the affected areas of Florida would be written in the noncompetitive environment created by the agreement alleged." *Id.*, para. 17. It is alleged that: "Irrespective of the other types of coverage offered by the defendants … the defendants and coconspirators refused to write windstorm coverage and directed consumers to the FWUA as the only source of windstorm coverage in the affected geographic coastal areas." *Id.* The effect, alleges Plaintiff, is that she must pay the premiums pegged and stabilized [by the FWUA—the Defendants acting in concert].

For relief, Plaintiff seeks for herself and the class alleged

> a refund of the amount of money paid to the defendant insurance companies which may be found by this Court and a properly impaneled jury to constitute the excess of premium payment occasioned by the unlawful conduct alleged in contrast to what a reasonable premium rate would have been if established in a competitive environment and absent the defendants' unlawful collaborative conduct.

*Id.*, para. 18. At oral argument, Plaintiff expressed a desire to amend the complaint to add a count for injunctive relief.

In short, Plaintiff claims that Defendants have fixed prices for windstorm insurance in certain Florida markets by (1) concertedly refusing to sell windstorm insurance individually on the open market, (2) thereby forcing Plaintiff and other consumers to buy windstorm coverage from the FWUA, where (3) the Defendants, as enabled by state law, concertedly peg the price at a level not reasonably related to risk. The monetary damages which are sought would be measured by the FWUA regulated premium less a hypothetical lower premium which would have been charged had Defendants competed against one another in the individual open market.

■ "The McCarran–Ferguson Act, 59 Stat. 33, as amended, 15 U.S.C. §§ 1011–1015, renders the federal antitrust laws inapplicable to the 'business of insurance' to the extent such business is regulated by state law and is not subject to the 'boycott' exception stated in § 1013(b)." *Group Life & Health Insurance Company v. Royal Drug Company*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) (Brennan, Marshal, Powell, J., and Burger, C.J., dissenting). *Accord, Hartford Fire Insurance Co. v. California*,

—— U.S. ——, ——–——, 113 S.Ct. 2891, 2900–2901, 125 L.Ed.2d 612 (1993). A finding that conduct is the "business of insurance" depends upon:

> *first,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry.

*Hartford,* 113 S.Ct. at 2901, quoting *Union Labor Life Insurance Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982).

All of Defendants' conduct as alleged in the complaint is the "business of insurance" as so defined. All of the conduct pertains to transferring and spreading a policyholder's risk. The setting of premium rates and terms is an integral part of the policy relationship between the insurer and the insured, and that activity is limited to entities in the insurance industry.

All of the conduct is also regulated by comprehensive statutes enacted by the State of Florida. The statute which regulates the rates set by the FWUA has been discussed above. Chapter 627, Fla.Stat., and particularly Fla.Stat. § 627.062 (1993) and such regulations as may have been adopted by the Florida Department of Insurance, regulate all other activities of Defendants with respect to the rates and terms of windstorm insurance on the open market in Florida. Florida also provides for regulation of the conduct alleged in the complaint pursuant to Chapter 626, Part X, §§ 626.951, *et seq.,* the Unfair Insurance Trade Practices Act.

This is enough regulation to make the McCarran–Ferguson Act exemption applicable. "The McCarran–Ferguson Act renders the federal antitrust laws inapplicable when state legislation generally prescribes, permits, or otherwise regulates the conduct in question and authorizes enforcement through a scheme of administrative supervision." *Crawford v. American Title Insurance Co.,* 518 F.2d 217, 218 (5th Cir.1975); *Uniforce Temporary Personnel v. National Council on Compensation Insurance, Inc., et al.,* 892 F.Supp. 1503, 1509 (S.D.Fla.1995) (attached to doc. 44).[1]

■ At oral argument, Plaintiff conceded that if her claim were only that Defendants had acted in concert to fix premium rates on their own windstorm insurance in Florida, then the McCarran–Ferguson Act would preclude her antitrust claim. Unquestionably this is true. The McCarran–Ferguson Act exempts cooperative ratemaking from antitrust law sanctions so long as the conduct is regulated by the state. *Royal Drug,* 440 U.S. at 221–224, 99 S.Ct. at 1078–1080. Plaintiff contends, however, that her suit is saved from that end by the allegation that Defendants have entirely refused to deal in the individual open market in order to force customers to buy from another entity, the FWUA. She contends that this is a § 3(b) boycott.

■ Section 3(b) of the McCarran–Ferguson Act, 15 U.S.C. § 1013(b), provides an exception for a Sherman Act claim[2] with respect to "any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." A concerted agreement to seek particular terms in particular transactions is not a "boycott" as intended by § 3(b), although such agreements would otherwise be unlawful under the Sherman Act. *Hartford,* —— U.S. at ——–——, 113 S.Ct. at 2912–2917.

In the *Hartford* case, the Court held that a "boycott" as intended by § 3(b) of the McCarran–Ferguson Act is a refusal to deal in transactions which are unrelated to the underlying transaction as to which a change

---

1. Plaintiff's citation to *Federal Trade Commission v. Ticor Title Insurance Co.,* 504 U.S. 621, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992) is inapposite. That case concerned state-action immunity from antitrust laws. 504 U.S. at 630, 112 S.Ct. at 2175. The state-action doctrine is premised upon "principles of federalism," 504 U.S. at 631, 112 S.Ct. at 2176, citing *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), where the doctrine was first announced. The state-action doctrine has nothing to do with the McCarran–Ferguson Act.

2. The exception does not apply to a Clayton Act claim. Thus, the analysis above is sufficient basis for judgment on the pleadings in favor of Defendants with respect to the Clayton Act claim without considering the boycott exception.

of terms is sought. As an example, the Court said that "no one would call [a labor strike] a boycott, because the conditions of the 'refusal to deal' relate directly to the terms of the refused transaction (the employment contract)." 113 S.Ct. at 2913. In contrast, it said: "A refusal to work changes from strike to boycott only when it seeks to obtain action from the employer unrelated to the employment contract." *Id.*

*Hartford* thus held that it was not a boycott for the defendant reinsurers to refuse to deal with primary insurers until they changed certain terms of their primary insurance contracts. 113 S.Ct. at 2914. It reasoned that the terms of the primary coverages "are *what* is reinsured." *Id.*, emphasis by the Court. It said:

> What matters is that the scope and predictability of the risks assumed in a reinsurance contract depend entirely upon the terms of the primary policies that are reinsured. The terms of the primary policies are the "subject-matter insured" by reinsurance, ... so that to insist upon certain primary-insurance terms as a condition of writing reinsurance is in no way "artificial"; and hence for a number of reinsurers to insist upon such terms jointly is in no way a "boycott."

113 S.Ct. at 2915.

*Hartford* did not entirely reject all claims of boycott made by plaintiffs. The Court noted that in one of the complaints, it was alleged that the defendant reinsurers had threatened to withdraw entirely from the business of reinsuring primary insurers who continued to use the disfavored insurance form. Construing this as a concerted refusal to reinsure not only for primary insurance on the disfavored form, but also for any other insurance written by the same primary insurers on other forms, the Court held this to state a claim of a McCarran–Ferguson boycott. 113 S.Ct. at 2916. This is so because a refusal to deal with respect to insurance other than on the disfavored form would have an "artificial" relationship to the terms of insurance on the disfavored form.

The reference in the *Hartford* case to an "artificial" relationship between the refusal to deal and the contractual terms sought is to the Court's decision in *St. Paul Fire & Ma-*

*rine Insurance Co. v. Barry,* 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). In the *St. Paul* case, plaintiffs were licensed physicians. Defendant St. Paul Fire & Marine Insurance Company wished to alter the terms of medical malpractice insurance policies it had issued to plaintiffs, and it intended to do so when those policies were renewed. To coerce this result, St. Paul had entered into an agreement with three competing medical malpractice insurers such that the competitors would refuse to sell medical malpractice insurance to a former St. Paul customer who had refused to agree to St. Paul's new contractual terms. After setting forth these facts, *Hartford* said of the *St. Paul* case: "The insisted-upon condition of the boycott (not being a former St. Paul policyholder) was 'artificial': it bore no relationship (or an 'artificial' relationship) to the proposed contracts of insurance that the physicians wished to conclude with St. Paul's competitors." —— U.S. at ——, 113 S.Ct. at 2914.

Plaintiff argues that she has alleged a circumstance similar to that found in the *St. Paul* case. She points out: "It is hardly an exercise in market leverage directed toward the 'targeted transaction' ... when it is not the same insurance company to whom the business is routed." Doc. 38, p. 10. Plaintiff argues that because the insurance is ultimately issued by the FWUA instead of by an individual Defendant, the refusals to deal constitute "a clear use of coercive force used to achieve an *unrelated* transaction." *Id.*, emphasis added.

The case at bar, however, is more like the *Hartford* claim found not to be a boycott than the *St. Paul* claim. The transactions which have been refused here are not unrelated to the transactions the terms of which Defendants seek to control. Defendants are alleged to have concertedly refused to sell windstorm insurance in certain parts of the open market in Florida so that their customers are forced to seek windstorm insurance from the FWUA. Given the nature and composition of the FWUA, the policy issued by the FWUA is, in effect, issued by all Defendants and all Defendants share the risk. The concerted behavior achieves particular terms for the FWUA transactions: joint liability and, as Plaintiff alleges, higher rates. There is no artificial relationship between the

transactions refused and the terms of the transaction sought. The subject matter of the transactions refused and the transactions coerced, a risk of windstorm damage in particular areas in Florida, is the same. Judge Ryskamp's decision in the *Uniforce* case, *supra*, supports this conclusion.

That the relationship is not artificial can be seen if viewed from another perspective. Defendants could have continued to issue policies in the open market. They could have achieved the same end as now alleged by an agreement that each would use a single form of contract and charge common rates for coverage. They could also have achieved joint liability as to each contract separately written by a entering into an omnibus or umbrella reinsurance agreement (or a series of such agreements) making all Defendants jointly liable for the contracts of each. While that might have been cumbersome and expensive, it would have not have been a boycott because the concerted activity would have been clearly directed to the terms of the contracts issued. That instead they agreed to withdraw all contracts from the open market, regardless of terms, to force this result through contracts issued by the FWUA, is a distinction without any difference.

Thus, Plaintiff has not alleged a § 3(b) boycott. Defendants' motion for judgment on the pleadings should be granted. This disposition, if adopted by the court, will moot consideration of Defendants' second argument for judgment on the pleadings.

Accordingly, it is RECOMMENDED that the court GRANT Defendants' motion for judgment on the pleadings, doc. 27, and direct the Clerk to enter judgment in their favor.

IN CHAMBERS at Tallahassee, Florida, this 9th day of June, 1995.