**MAINE AFL–CIO**

v.

**SUPERINTENDENT OF INSURANCE, et al.**

Supreme Judicial Court of Maine.

Argued May 22, 1991.
Decided July 26, 1991.

Patrick N. McTeague (orally), McTeague, Higbee, Libner, MacAdam, Case & Watson, Topsham, for plaintiff.

Harold C. Pachios (orally), Preti, Flaherty, Beliveau & Pachios, Portland, and Linda M. Pistner (orally), Asst. Atty. Gen., Augusta, for defendants N.C.C.I. and Superintendent.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD, COLLINS and BRODY, JJ.

BRODY, Justice.

The Maine AFL–CIO appeals from an order by the Superior Court (Kennebec County, *Alexander, J.*) affirming a workers' compensation insurance ratesetting decision and order entered by the Superintendent of Insurance. On appeal, the AFL–CIO contends that the Superintendent's findings are inadequate to enable effective judicial review. The AFL–CIO further contends that the rates, surcharges and fees set by the Superintendent lack the support of competent evidence and that the Superintendent failed to comply with statutory standards in setting them. Finding no error, we affirm the Superintendent's decision and order.

In Maine, workers' compensation insurance is divided into two markets, the voluntary market and the residual market. The residual market is an assigned risk pool designed to protect insurance carriers from risks that make it economically unattractive to underwrite specific employers voluntarily, thereby providing coverage for employers otherwise unable to find insurers willing to insure them. The residual market is subdivided into an accident prevention account that services employers with demonstrated accident frequency problems and a safety pool that services employers that have good safety records but, nonetheless, have trouble procuring insurance in the voluntary market. All insurance companies authorized to write workers' compensation insurance in Maine must participate, either directly or indirectly, in the assigned risk pool. 24–A M.R.S.A. § 2366(1) (1990). Insurance companies that participate directly are called "servicing carriers." These companies handle billing, process claims and provide other services to residual market policy holders. Me. Bureau Ins. Rules, ch. 440, subch. II § 10(D) (March 20, 1988). Insurance companies that do not service residual market policies directly are required to pay a fee to compensate the servicing carriers for their expenses in servicing the residual market. Me. Bureau Ins. Rules, ch. 440, subch. II § IO(C)(1). As a quid pro quo for required participation in the residual market, insurance carriers receive a "fresh start surcharge" to compensate for any loss in revenue in the residual market that would cause them to earn less than a reasonable rate of return on the policies issued in the State of Maine. 24–A M.R.S.A. § 2367 (Supp.1990). The fresh start surcharge is designed to address concerns that mandatory participation in the assigned risk pool may be confiscatory and to stem the flight of workers' compensation insurance carriers from the State. *See National Council on Compensation Ins. v. Superintendent of Ins.,* 538 A.2d 759, 760–61 (Me.1988).

Under the current statutory scheme, the Superintendent of Insurance must approve voluntary and residual market workers' compensation insurance rates in an annual ratemaking proceeding. 24–A M.R.S.A. § 2362 (1990). The proceeding is adjudicatory in nature and is conducted in accordance with 5 M.R.S.A. §§ 9051–9064 (1989 & Supp.1990); 24–A M.R.S.A. §§ 229–235 (1990); and Me. Bureau of Ins. Rules, ch. 350 (Nov. 5, 1984). In approving workers' compensation insurance rates that are just and reasonable, the Superintendent must adhere to standards set forth by statute.

24–A M.R.S.A. § 2363(7) (1990). Once system-wide rates are approved by the Superintendent, individual rate schedules based upon those rates are prepared for each industry depending upon its loss experience and risk classification.

In addition to approving overall rate increases, the Superintendent must annually review the reasonableness of the fee paid to insurers servicing the residual market, 24–A M.R.S.A. § 2363(7–A) (1990); Me. Bureau Ins. Reg., ch. 440, subch. II § 10(C)(1), and, if necessary, establish a fresh start surcharge. 24–A M.R.S.A. § 2367. In setting the servicing carrier fee and the fresh start surcharge, the Superintendent must comply with the general statutory standards for ratesetting set forth in 24–A M.R.S.A. § 2363(7) as well as the specific statutory requirements provided in 24–A M.R.S.A. §§ 2363(7–A) and 2367 and the corresponding Bureau of Insurance Rules and Regulations.

In December, 1989, the National Council on Compensation Insurance ("NCCI"), an advisory organization that represents workers' compensation insurance carriers in ratemaking matters, filed with the Superintendent proposed workers' compensation insurance rate increases for 1990. Among other things, NCCI sought a 26 percent average increase in the voluntary market and safety pool premium rates and a 32.3 percent average increase in the accident prevention account premium rates. NCCI also requested an increase in the servicing carrier fee and a fresh start surcharge sufficient to compensate insurance carriers for a claimed loss of revenue in the residual market of approximately $40 million.

The Superintendent consolidated the ratemaking, servicing fee and fresh start surcharge requests into one public proceeding. Initially, only NCCI and the Public Advocate, 24–A M.R.S.A. § 2363(9) (1990), were designated as parties. The Superintendent subsequently granted intervenor status to the Maine Chamber of Commerce

and Industry and the AFL–CIO and limited intervenor status to a number of Maine business associations and corporations pursuant to 5 M.R.S.A. § 9054(1) & (2) (1989).

Public hearings commenced on February 12, 1990 and closed on April 6, 1990. At the hearings, testimony was taken from witnesses for the parties and intervenors regarding the reasonableness of the rate increases, fresh start surcharge and servicing fee requests submitted by NCCI. NCCI had the burden of establishing that the increases it requested were just and reasonable. 24–A M.R.S.A. § 2363(7)(D).

On April 17, 1990, the Superintendent issued a decision and order finding the increases requested by NCCI excessive. The Superintendent concluded, based on his experience and the evidence before him, that the following rate increases were just and reasonable: a 4 percent average rate increase for the voluntary market and safety pool part of the residual market; a 9.2 percent average rate increase for the accident prevention account of the residual market; a fresh start surcharge of 3 percent to recoup approximately $10 million of a $14 million deficit in the residual market; and a servicing carrier fee of 25.6 percent, a continuation of the fee set in 1989.[1] The Superintendent further found that insurance carrier mismanagement is a significant problem in Maine and imposed a 1.5 percent penalty to be deducted from the approved rate increases.

On May 16, 1990, the AFL–CIO filed a timely petition pursuant to M.R.Civ.P. 80C seeking judicial review of the Superintendent's decision. None of the other parties or intervenors appealed. Before the Superior Court, the AFL–CIO contended that the Superintendent's findings are inadequate to enable effective judicial review, the Superintendent's approval of the modified rate increases, fresh start surcharge and continuation of the 1989 servicing carrier fee lack the support of substantial evidence in the record and that the Superintendent failed

---

**1.** In his decision and order, the Superintendent set additional rates which are not directly pertinent to this appeal.

to comply with statutory rate approval standards.

■ On October 17, 1990, the Superior Court affirmed the Superintendent's decision and the AFL–CIO appealed, reasserting the same contentions presented to the Superior Court. Because the Superior Court acted as an intermediate appellate court, this court reviews the Superintendent's decision directly. *Huard v. M.S.R.S. Bd. of Trustees,* 562 A.2d 694, 695 (Me. 1989); *York Mutual Ins. Co. v. Superintendent of Ins.,* 485 A.2d 239, 241 (Me. 1984).

I

The AFL–CIO contends that the Superintendent's decision and order fails to meet the requirements of the Administrative Procedure Act, 5 M.R.S.A. §§ 8001–11008 (1989 & Supp.1990), because it is conclusory and lacks findings of basic facts necessary for effective judicial review. We disagree.

■ The Administrative Procedure Act requires that "agency decisions made at the conclusion of an adjudicatory proceeding shall be in writing or stated in the record, and shall include findings of fact sufficient to apprise the parties and any interested member of the public of the basis for the decision." 5 M.R.S.A. § 9061. A workers' compensation insurance ratemaking proceeding is an adjudicatory proceeding and thus section 9061 applies. *See* 24–A M.R.S.A. §§ 229–235 and 2363(11). The reasons for requiring administrative findings of fact are to facilitate judicial review, avoid judicial usurpation of administrative functions, assure more careful administrative considerations, help parties plan cases for rehearing or judicial review and to keep agencies within their jurisdiction. *See Gashgai v. Board of Registration in Medicine,* 390 A.2d 1080, 1085 (Me.

1978). Section 9061 does not require detailed incident-by-incident fact finding but rather requires only that the agency include findings of fact sufficient to apprise the parties and interested members of the public of the basis for the decision. *Merrow v. Maine Unemployment Ins. Comm'n,* 495 A.2d 1197, 1201–02 (Me. 1985); *Bean v. Maine Unemployment Ins. Comm'n,* 485 A.2d 630, 634 (Me.1984); *Cotton v. Maine Employment Sec. Comm'n,* 431 A.2d 637, 639 (Me.1981).

■ The AFL–CIO argues that the Superintendent failed to render specific findings of fact on incurred losses and expenses in the residual market, the actual expenses of carriers servicing the residual market and the present impact on the residual market deficit of 1987 legislation cutting workers' compensation benefits.[2] The AFL–CIO also contends that the Superintendent failed to adequately explain how he arrived at his estimate of the impact of insurance carrier mismanagement upon workers' compensation rates. Absent such findings and explanations, the AFL–CIO contends, judicial review is meaningless.

Although the Superintendent could have been more specific in stating basic findings of fact, we find that the absence of detailed findings of fact on incurred losses and expenses in the residual market, the actual expenses of servicing carriers and more particular findings regarding the impact of the 1987 benefit cuts does not frustrate judicial review. Taken as a whole, the Superintendent's findings are reasonably sufficient to apprise the parties and any interested member of the public of the basis for his decision regarding the basic rates, servicing carrier fee and fresh start surcharge set for 1990. We also find that the Superintendent's decision is adequate to apprise the parties and all interested persons that the Superintendent's estimate of the systemic impact of insurance carrier

2. The AFL–CIO has cited three major statutory changes in incapacity benefits accomplished in November 1987 that it claims the Superintendent ignored: (i) limitation of the duration of partial disability benefits to 400 weeks plus the period of maximum medical improvement, 39 M.R.S.A. § 55–B (Supp.1990); (ii) adjustments in inflation protection, *see* 39 M.R.S.A. § 54–B and 55–B (1989 & Supp.1990); and (iii) limitation of disability benefits only to persons who cannot find full time employment anywhere in the State. 39 M.R.S.A. § 54–B(2). The amendments apply only to policies written after 1988.

mismanagement was based on his expert judgment, which he had authority to exercise, in light of the evidence presented to him by the parties. We conclude that the requirements of the Administrative Procedure Act have been satisfied.

## II

 In reviewing the substance of administrative ratemaking decisions, we employ two basic tenets of appellate review: (i) the administrative agency, not the court, is the judge of facts and (ii) the agency's findings of fact are final when supported by substantial evidence in the record. *New England Tel. & Tel. Co. v. Public Util. Comm'n*, 448 A.2d 272, 278–79 (Me.1982). Acknowledging that the Superintendent of Insurance must be cognizant of numerous economic and actuarial variables and evaluate conflicting evidence interpreting and applying those variables, we necessarily defer to his expert judgment in choosing among various ratemaking techniques or methodologies, provided they are reasonably accurate. We do not, nor should we attempt to second-guess the Superintendent on matters falling within the realm of his expertise. *Cf. LaGasse v. Hannaford Bros. Co.*, 497 A.2d 1112, 1118 (Me.1985);

*Central Maine Power Co. v. Public Util. Comm'n*, 455 A.2d 34, 38–39 (Me.1983). We will interfere only when the Superintendent abuses the discretion entrusted to him, fails to follow a legislative mandate or violates the federal or state constitutions. *Cf. New England Tel. & Tel. Co.*, 448 A.2d at 279. We also accord due consideration to the Superintendent's interpretation and application of technical statutes and regulations and will overturn the Superintendent's action only if the statute or regulation plainly compels a contrary result. *See LeBlanc v. United Eng. & Constructors*, 584 A.2d 675, 677 (Me.1991); *York Mutual Ins. Co. v. Superintendent of Ins.*, 485 A.2d at 241. In sum, our review is limited to determining, in the light of the record, whether the overall rates established by the Superintendent are unreasonable, unjust or unlawful. *Cf. Central Maine Power*, 455 A.2d at 39.

 Under 24–A M.R.S.A. § 2363(7)(D), the NCCI has the initial burden of proving that its proposed rate increases are just and reasonable. Based on NCCI's filing and all sworn testimony presented at the hearing and following the standards for approval of workers' compensation rates set forth in 24–A M.R.S.A. § 2363(7),[3] the

---

**3.** 24–A M.R.S.A. § 2363(7) provides in pertinent part:

**Standard for approval.** This subsection applies to determination of just and reasonable rates for filing.

A. The superintendent shall establish rates, based on the filing and sworn testimony, which are, in addition to any other requirements:

(1) Just and reasonable and not excessive, inadequate or unfairly discriminatory; and

(2) Based only on a just and reasonable profit.

B. In establishing just and reasonable rates, the superintendent shall consider:

(1) The reasonableness of any return on capital and surplus allocable to the coverage of risks in this state;

(2) The reasonableness of the amounts of capital and surplus allocable to the coverage or risks in this State;

(3) The reported investment income earned or realized from funds generated from business in this State;

(4) The reported loss reserves, including the methods and interest rates used in determining the present value for reported reserves

and the use of those reserves in the determination of the proposed rates;

(5) The reported annual losses and loss adjustment expenses:

(6) The measures taken to contain costs, including loss control, loss adjustment and employee safety engineering programs;

(7) The relationship of the aggregate amount of operating expenses reported by all companies to the annual operating expenses reported in the filing and the annual insurance expense exhibits filed by each company with the superintendent;

(8) The impact of operating and management efficiency of the companies on expense levels and the effect of variations in expense levels on rates; and

(9) Any premium surcharges or credits ordered by the superintendent pursuant to section 2367.

C. The justness and reasonableness of rates shall be determined for the period in which the rates are in effect. Deficits in the residual market in any preceding year may not be included in the determination of rates.

D. The filer shall have the burden of proving that the rates meet the requirements of this chapter and chapter 23.

Superintendent of Insurance is to establish rates that are "just and reasonable and not excessive, inadequate or unfairly discriminatory" and "based only on a just and reasonable profit." 24–A M.R.S.A. § 2363(7)(A). On appeal, the party challenging the rates established by the Superintendent bears the burden of demonstrating that the rates are unreasonable, excessive, inadequate or unfairly discriminatory or that the Superintendent otherwise committed legal error. *See* Appleman, Insurance Law and Practice § 4597 at 150 (Berdal ed.1979).

### The Basic Rates

■ The AFL–CIO contends that the Superintendent exceeded his authority and violated the statutory standards for rate approval by estimating the systemic impact of insurer mismanagement. In the absence of concrete data regarding the impact of insurer mismanagement, the AFL–CIO argues, the Superintendent was required to deny NCCI's filing altogether, . require NCCI to prepare operating cost data that demonstrably excludes all costs attributable to mismanagement, or conduct his own thorough investigation of the systemic impact of carrier mismanagement. We disagree.

24–A M.R.S.A. § 2363(7)(E) provides that the Superintendent "may not approve an increase or decrease in rates unless he finds that the information supplied in the filing and sworn testimony is accurate and sufficient to meet the requirements of [the statutory standards for rate approval]." Sections 2363(7)(B)(6) and (8) further require the Superintendent to consider evidence of carrier management efficiency in assessing the reasonableness of the proposed rate increases. The statute does not specify what kinds of evidence the Superintendent should consider in attempting to quantify the cost of mismanagement and

appears to give the Superintendent considerable authority to exercise his own judgment in this area. Clearly, the statute does not require the Superintendent to reject the NCCI's filing in its entirety whenever he finds evidence of mismanagement.[4] Rather, the Superintendent is instructed to make appropriate adjustments in determining a rate that is "just and reasonable." 24–A M.R.S.A. § 2363(7)(A).

The Public Advocate conducted a study of carrier efficiency which revealed evidence of mismanagement, including poor servicing practices, insufficient safety inspections and settling claims for excessive amounts, in approximately 30 percent of the companies writing workers' compensation insurance in Maine. The Superintendent accepted the accuracy of the Public Advocate's empirical evidence but rejected the Public Advocate's estimate of the impact of mismanagement upon the entire workers' compensation system. Using his own experience as a guide, the Superintendent estimated that a 1.5 percent penalty would be adequate to compensate the system for the extra costs attributable to mismanagement. The Superintendent did not indicate what methodology he used to reach this estimate, nor did he point to any specific data in the record to support it. And, he candidly admits that his finding regarding the systemic impact of mismanagement is a rough estimate. It is inaccurate to suggest, however, as the AFL–CIO does, that the Superintendent's finding was made up out of whole cloth. The Superintendent's finding was based upon concrete factual evidence presented by the Public Advocate. The Superintendent appropriately used his own judgment to quantify the systemic impact of this evidence. It is unclear what benefit would have been gained by further factfinding on this issue because, in the final analysis, the judgment of an expert familiar with the working of

E. The superintendent may not approve an increase or decrease in rates unless he finds that the information supplied in the filing and sworn testimony is accurate and sufficient to meet the requirements of this section.

4. Over seven years ago, the Legislature repealed a workers' compensation ratesetting statute that

limited the Superintendent's power to approving or disapproving a requested rate increase in its entirety. 39 M.R.S.A. § 22(6), *repealed* by P.L.1983, ch. 509 § 1; P.L.1983, ch. 816 § B, 22 (effective April 24, 1984).

the system would be required. We are satisfied that the Superintendent acted within the scope of his authority in exercising his judgment on this issue and his finding will not be disturbed on appeal. *Cf. LaGasse*, 497 A.2d at 1118; *Central Maine Power*, 455 A.2d at 38–39. The AFL–CIO has cited no evidence indicating the overall rate increases approved by the Superintendent are otherwise unreasonable or unjust. *Cf. Central Maine Power*, 455 A.2d at 39.

### Fresh Start Surcharge

▇▇▇ The AFL–CIO contends that the Superintendent over-estimated the residual market deficit by failing to take into account savings resulting from 1987 workers' compensation benefit cuts and, thus, established an excessive fresh start surcharge. Again, we disagree.

24–A M.R.S.A. § 2367 [5] instructs the Superintendent to compare the losses and expenses incurred by carriers in the residual market with the premiums and investment income generated in that market. If incurred losses and expenses are greater than premiums and investment income so that the insurance carriers do not get a fair return on the policies issued, the statute provides for their entitlement to a fresh start surcharge. 24–A M.R.S.A. § 2367(2). Section 2367 does not specifically require

the Superintendent to make adjustments for savings resulting from legislative amendments but does say that he should consider "all relevant factors" in determining whether the rate of return earned in the residual market is reasonable. 24–A M.R.S.A. § 2367(2)(A).

The record reveals that the Superintendent was presented with and considered evidence regarding incurred losses and expenses, premium and investment income and profits earned in the residual market. Based upon this evidence, the Superintendent found that the incurred losses and expenses exceeded premiums and investment income and that a surcharge must be established to make up the resulting deficit. The record then reveals a huge discrepancy between the parties' estimate of the size of the deficit: NCCI estimated the deficit to be approximately $40 million; the Public Advocate estimated it between $11 million and $14 million; the AFL–CIO did not suggest a figure. The Superintendent flatly rejected NCCI's estimate and found the residual market deficit to be $14 million.

The AFL–CIO suspects that the discrepancy in the deficit figure estimates had something to do with differences of opinion regarding the current impact of certain 1987 benefit cuts specifically the 400 week cap on certain disability benefits and infla-

---

**5.** 24–A M.R.S.A. § 2367 provides in pertinent part:

**Workers' compensation rates; annual surcharges and credits**

Beginning in 1990, the superintendent shall annually determine, [sic] whether premiums collected from risks in the residual market and investment income allocable to those premiums are greater or less than the incurred losses and expenses associated with that market.

. . . . .

2. Premium deficit. Payment of any premium deficit shall be determined in the following manner.

A. If the superintendent determines that premiums and investment income attributable to those premiums are less than incurred losses and expenses in the residual market, the superintendent shall then determine the rate of return for the insurance industry in the entire Maine workers' compensation market. If the rate of return is found, consider-

ing all relevant factors, to be less than reasonable, the superintendent shall order a surcharge on premiums paid by insureds in both the voluntary and involuntary markets and employers who were in either market during the policy year for which the deficit was determined but who have since become self-insured.

B. Any deficit determined by the superintendent pursuant to paragraph A is not the responsibility of the insurers on an individual or collective basis but is the financial obligation of all insured employers in the State, including employers who were insured during the policy year for which the deficit has been determined but who have since become self-insured. The surcharge must be an amount at least to offset the adverse cash flows resultant from the deficiency, provided that the application of such surcharge does not produce a rate of return in excess of a just and reasonable profit in the entire Maine workers' compensation market ...

tion protection adjustments.[6] Indeed, all parties agree that these benefit cuts will, at some point, significantly decrease the amounts insurers will have to pay out on claims thereby reducing incurred losses which in turn would lower the residual market deficit. There is, however, significant dispute over the extent to which these cuts are currently affecting the deficit. Without presenting any data or calculations to support its position, the AFL–CIO contends that there is a quantifiable present impact that should be reflected in the reserves for future payments on injuries currently in the system. Because reserves make up a component of incurred losses, the AFL–CIO contends that the impact should be reflected in the incurred loss statistics for 1990. This methodological argument was rejected by the Superintendent who decided not to adjust the loss figures to compensate for the 1987 benefit cuts cited by the AFL–CIO because, in his judgment, the savings could not be accurately quantified at the present time. On the basis of the evidence before him, the Superintendent concluded that a 3 percent fresh start surcharge would allow the carriers to recoup approximately $10 million of the existing deficit while allowing a $4 million leeway for savings from the benefit cuts, to the extent that any impact might be felt during 1990. We will not interfere with the Superintendent's expert judgment regarding the present impact of the 1987 benefit cuts.

■ We further conclude that the Superintendent's finding regarding the current size of the residual market deficit is supported by evidence in the record. Although the Superintendent's finding ($14 million) is approximately $26 million less than NCCI's estimate ($40 million), an estimate that he flatly rejected, and $3 million greater than the Public Advocate's lowest estimate ($11 million), the AFL–CIO has cited no evidence that would compel us to disturb the Superintendent's finding. Even if the Superintendent's estimate is too high, he has made appropriate allowance by leaving a $4 million leeway in the surcharge. The AFL–CIO has failed to establish that the Superintendent's decision to impose the 3 percent surcharge would produce a rate of return in excess of a just and reasonable profit for the insurance carriers. We cannot conclude, therefore, that the surcharge established by the Superintendent is unreasonable, unfair or lacking in evidentiary support.

### Servicing Carrier Fee

■ Finally, the AFL–CIO contends that the Superintendent's decision to continue the servicing carrier fee set in 1989 was based upon his conclusion that the overall rate increase for 1990 was small rather than upon evidence that a 25.6 percent fee is reasonable in light of the current actual expenses of the carriers servicing the residual market. In this respect, the AFL–CIO contends that the Superintendent failed to comply with statutory standards.

24–A M.R.S.A. § 2363(7–A) provides:

**Fee for servicing residual market.** In every rate filing in which the rating bureau requests a rate adjustment, the superintendent shall take evidence on the issue of whether the fee for servicing the residual market is reasonable. Concurrent with the decision on the rate adjustment, the superintendent shall issue a decision on whether the fee is reasonable, taking into account the rate adjustment approved. If the superintendent determines that the fee is not reasonable, the superintendent shall order an adjustment to the fee, as necessary, to insure that the fee is reasonable.

The Bureau of Insurance Rule implementing section 2363(7–A) provides that the review "shall consider the actual expenses of servicing carriers." Me. Bureau of Ins. Rules, ch. 440 § 10(C)(1).[7]

---

6. *See* footnote 2.

7. Me.Bureau Ins.Rules, ch. 440, subch. II § 10(C)(1) provides:

**Service allowance.** Service carriers shall receive a servicing allowance or fee as compensation for all expenses of servicing.

(1) Except as provided in paragraph (2) [not applicable here], a servicing carrier shall

In his decision, the Superintendent found that the existing fee of 25.6 percent of premiums paid was reasonable given that the overall premium rate increase he approved for 1990 was relatively small. Given the language of section 2363(7–A), the size of the rate increase is clearly relevant on this issue. NCCI's filing contains extensive data regarding the actual expenses of carriers servicing the residual market and the administrative record reveals that the reasonableness of the existing fee was discussed at length during the hearings. On the basis of the evidence, NCCI requested an increase in the fee; the Public Advocate recommended that the fee be reduced to 23.1 percent of premiums paid for 1990. Rejecting both positions, the Superintendent decided that, in the interest of maintaining current levels of servicing, the fee would best be left at 25.6 percent. The AFL–CIO has not presented any statistics indicating that the residual market servicing expenses have changed significantly during the past year and fails to articulate any compelling reason why continuing the fee set in 1989 is unreasonable. In short, the AFL–CIO merely asserts that the Superintendent neglected to consider the actual expense evidence submitted by NCCI without citing any evidence that would compel the court to conclude that the Superintendent's decision to continue the 25.6 percent fee is unreasonable in light of the data on actual expenses.

In reviewing ratesetting decisions, the court defers to the expertise of the Superintendent. While the findings could certainly have been more specifically articulated, the Superintendent complied with the statutory standards of workers' compensation rate approval. The AFL–CIO has failed to sustain its burden of proving that the rates, fresh start surcharge and servicing carrier fee set by the Superintendent are unreasonable, unjust or unlawful. *Cf. Central Maine Power*, 455 A.2d at 39.

The entry is:

Judgment affirmed.

All concurring.

receive as its fee an amount equal to 30% of the total written premium plus producer fees paid on policies serviced. The amount of the servicing fee shall be subject to annual review by the Superintendent and modified as appropriate. The review shall consider the actual expenses of servicing carriers including, but not limited to, state premium tax, general and other state expenses, unallocated loss adjustment expenses, allocated loss adjustment expenses for workers' compensation claims, and state assessments (e.g. second injury fund). Expenses for commissions shall be separately reimbursed. Allocated loss adjustment expenses for employer liability claims are reportable as losses and are not included within the servicing fee. Any guarantee fund assessments shall be an expense of the Plan and reimbursable to the servicing carriers. For purposes of determining whether a surcharge shall be imposed, the Superintendent shall make findings on an aggregate basis as to the amount of the actual expenses covered by the servicing fee and the portion of the servicing fee which is profit, and shall take any profit into account in determining the return on residual market policies.

In his 1989 review of the servicing carrier fee, the Superintendent concluded that the 30 percent fee established by this regulation is excessive. *In re Annual Review of Servicing Carrier Allowance Available in the Workers' Compensation Residual Market* (Me.Bur.Ins. May 16, 1989). The regulation will be amended accordingly.