SANDY RIVER NURSING CARE
CENTER, et al., Plaintiffs,

v.

NATIONAL COUNCIL ON COM-
PENSATION INSURANCE,
et al., Defendants.

Civ. No. 91–0210–B.

United States District Court,
D. Maine.

June 18, 1992.

were injured by workers' compensation rate increases approved by the Maine Superintendent of Insurance after the Maine legislature enacted a law in 1987 permitting insurers to apply for rate hikes exceeding ceilings allowed under prior law. The Plaintiffs complain that the 1987 legislation was enacted because insurers successfully conspired to pressure the Maine legislature by threatening to withdraw from the workers' compensation insurance market. The Plaintiffs seek to recover damages for the increased premiums they have paid since the 1987 legislation was passed and higher workers' compensation insurance rates were approved. Plaintiffs acknowledge that the premiums charged by the insurers were lawful, at least insofar as they were authorized by the legislature and approved by the Superintendent of Insurance. Because federal antitrust laws generally neither prohibit private actors from collectively seeking favorable rate legislation from States nor provide relief to persons proximately injured by legislation passed by States, Defendants' motion is GRANTED.

## I. BACKGROUND

### A. *The Complaint*

Thirteen Maine businesses filed this class action[1] on September 12, 1991, against the National Council on Compensation Insurance ("NCCI"), an insurance rating organization, and fourteen named insurance companies together with their subsidiaries and affiliates.[2] The Plaintiffs' four count complaint alleges that "the defendants entered into a conspiracy to fix the price of workers' compensation insurance sold in Maine

Sidney St. F. Thaxter, Curtis, Thaxter, Stevens, Broder & Micoleau, Portland, Me., for plaintiffs.

Peter J. Rubin, Bernstein, Shur, Sawyer & Nelson, Portland, Me., for defendants.

## ORDER AND MEMORANDUM OF OPINION

BRODY, District Judge.

■ This antitrust action is before the Court on Defendants' motion for summary judgment. The Plaintiffs allege that they

1. The Plaintiffs seek to represent all employers (excluding defendants and co-conspirators, including any subsidiary or affiliate thereof and excluding those employers who were self-insured) doing business in the State of Maine required by Maine law to carry workers' compensation insurance coverage between November 20, 1987 and the present date (hereinafter "the damage period") [who] purchased policies of workers' compensation insurance from one or more of the named defendants including any subsidiary or affiliate thereof or from one or more of defendants' co-conspirators, or from any insurance

company utilizing the higher rates for workers' compensation insurance which resulted from defendants' unlawful conspiracy. Cmplt. ¶ 24(a).

By agreement of the parties, consideration of the Plaintiffs' motion for class certification was deferred until after a decision on Defendants' motion for summary judgment issued.

2. The Plaintiffs filed a "First Amended Complaint" on December 4, 1991, which differs from the original complaint only in that it adds The Hartford and its affiliates and subsidiaries as defendants.

[Count I]; and to effectuate that conspiracy by acting and agreeing to boycott, coerce and intimidate Maine employers [Count II] and Maine insurers [Count III]" in violation of federal antitrust law. Plaintiffs' Memorandum in Opposition to Defendants' Joint Motion for Summary Judgment at 2. Count IV of the complaint, which the Plaintiffs discussed in neither of their memoranda nor at oral argument, charges that Defendants' conduct violated Maine antitrust law as well.

Plaintiffs indicate that the true object of the suit is "Defendants' private, unsupervised conspiracy to extract higher prices from Maine employers by utilizing their [i.e., Defendants'] collective economic power to ... coerce and intimidate ... the State of Maine." *Id.* at 2–3. According to the Plaintiffs, "Defendants entered into the conspiracy ... with the objective of coercing the enactment of favorable legislation to permit these Defendants to charge the higher prices they had agreed upon." *Id.* at 3.

### B. *Maine's Workers' Compensation Market*

Workers' compensation insurance has long been—and remains—an extremely sensitive political issue in Maine. Regulation is strict. All employers who do not self-insure are required to purchase workers' compensation insurance. Insurers are "required by Maine law to charge only those rates for workers' compensation insurance which have been filed with, and approved by, the Maine Superintendent of Insurance in conformance with Maine Law." Cmplt. ¶ 32.

Neither the insurers nor the insureds are happy with the regulatory regime. Businesses believe that rates are too high. Insurers believe that rates are too low. Consequently, workers' compensation is a perennial political battleground.

According to the Plaintiffs, NCCI and the insurance industry's dissatisfaction with the rates insurers were permitted to charge dates at least back to 1981. Plaintiffs' Memo at 5 (citing *National Council on Compensation Ins. v. Superintendent of Ins.,* 481 A.2d 775 (Me.1984) (affirming Superintendent's disapproval of a requested rate increase of 27.5%; NCCI had claimed that statistical evidence showed that a 110% increase was warranted)). NCCI and its members have consistently lobbied for legislation permitting them to charge higher rates and lowering statutory benefits. Between 1981 and 1985, their efforts were unsuccessful.

### C. *The 1985 Legislation*

In 1985, the Maine legislature enacted the "Workers' Compensation Competitive Rating Act," 1985 Me.Laws Ch. 372 ("1985 Act"), rolling back workers' compensation insurance rates 8% and freezing rates at that level until 1987. Under the 1985 Act, insurers were prohibited from requesting rate increases exceeding 10% in 1987, 1988, or 1989. 24–A M.R.S.A. § 2355 (1985). In addition, the 1985 Act declared that it was intended, *inter alia:*

1 ... To prohibit price fixing agreements and other anti-competitive behavior by insurers.

...

3 ... To promote price competition among insurers....

24–A M.R.S.A. § 2332 (1985).

The rate reduction and caps on future increases greatly displeased the insurance industry. The insurers attacked the 1985 Act in court, but their litigation efforts were no more successful than their lobby efforts. Although the Maine Superior Court determined that the rate ceilings were so low they were confiscatory, the court held that the ceilings were not unconstitutional because insurers were free to withdraw from the market for workers' compensation insurance in Maine. *National Council on Compensation Ins. v. Superintendent of Ins.,* CV–85–459 *et seq.* (Sup.Ct. May 14, 1987) (Alexander, J.), *appeal dismissed,* 538 A.2d 759 (Me.1988) (appeal dismissed as moot because legislation passed in November 1987 repealed 1985 Act).

According to the Plaintiffs, "beginning in the late summer of 1987 and continuing through October, 1987 'virtually all insur-

ers in the Maine Workers' Compensation Market'" prepared to withdraw from Maine. Plaintiffs' Memo at 9 (quoting affidavit of Sidney St.F Thaxter, Exhibit A). Significantly injured, insurers responsible for writing over 90% of workers' compensation in Maine filed plans for withdrawal from the state that were approved by the Superintendent of Insurance.

### D. The 1987 Legislation

In the fall of 1987, facing a "potential crisis," 1987 Me.Laws 2585, Governor John McKernan convened a special session of the legislature devoted exclusively to reviewing and reforming Maine's workers' compensation system. With the State's attention focused on this issue, the legislature approved an Act to Improve the Maine Workers' Compensation System, 1987 Me. Laws Ch. 559 ("1987 Act"). The insurers recovered ground they had lost in 1985. The 1987 Act removed the limitations on rate increases contained in the 1985 Act. The 1987 Act also permitted NCCI to act as an agent for its members by submitting joint rate proposals on behalf of insurers, deemphasizing the role price competition played under the 1985 Act.

Under the 1987 Act, as under prior law, rates require state approval. "The Superintendent of Insurance must approve ... workers' compensation insurance rates in an annual ratemaking proceeding.... The proceeding is adjudicatory in nature and is conducted in accordance with [the Maine Administrative Procedure Act]." *Maine AFL–CIO v. Superintendent of Ins.*, 595 A.2d 424, 426 (Me.1991) (Brody, J.). Testimony is taken, and interested parties are permitted to participate. The Superintendent of Insurance may accept the rates proposed or set them at a "just and reasonable level." *Id.* There is no "negative option" permitting new rates to go into effect if the Superintendent fails to act.

In 1988, 1989, and 1990, workers' compensation insurers applied for rate hikes exceeding the limits set by the 1985 Act and repealed by the 1987 Act. Each year, the Superintendent of Insurance rejected the rate increases requested by the insurers, but authorized lower increases. Affidavit of Joseph A. Edwards at ¶¶ 19, 29.

### E. The Nature and Source of Plaintiffs' Injury

The Plaintiffs do not allege that the insurers charged unlawful rates. *See* Cmplt. ¶ 32. Nor do the Plaintiffs contend that the insurers refused to sell them insurance. The Plaintiffs do not allege that they were directly injured by the Defendants' alleged conspiracy. And the Plaintiffs do not allege that they were injured *before* the legislature repealed the 1985 Act and the Superintendent of Insurance approved higher rates. Rather, the Plaintiffs complain that they were injured because they have been required to pay "workers' compensation insurance premiums and charges which [were] substantially higher than they would have been in the absence of Defendants' unlawful conspiracy." Cmplt. ¶ 55. Plaintiffs' alleged injury is directly traceable to the 1987 legislation and to the approval of rate increases by the Maine Superintendent of Insurance.

## II. SUMMARY JUDGMENT STANDARD

The applicable standard is familiar. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

We need not linger long over Plaintiffs' arguments that this is an inappropriate case for summary judgment. The Plaintiffs made no serious effort in their memoranda of law to identify any controverted issues of material fact. Indeed, at oral argument, Plaintiffs conceded that there are no material facts in dispute. Transcript of Hearing on Motion for Summary Judgment at 21 (April 23, 1992). In the absence of any disputed issues of material

fact, this Court turns to the legal issues raised by this case.[3]

## III. PARKER/NOERR IMMUNITY

The dispositive issues are whether federal antitrust law provides a remedy to plaintiffs who allege that they have been injured by anticompetitive state legislation or by the collective efforts of private actors to promote anticompetitive legislation. To answer these questions, the Court must survey the fuzzy boundary between economic and political activity and determine the how far across that boundary the Sherman Act reaches under Supreme Court decisions.

The statutory bases for Plaintiffs' suit are the Sherman Act and the Clayton Act. The Sherman Act prohibits:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations.

15 U.S.C. § 1 (1988). The Clayton Act provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15 (1988).

■ Although the Sherman Act is over one hundred years-old, its underlying purposes and scope are still a matter of debate. Nevertheless, it is clear that the paramount objective of antitrust law is economic. The Sherman Act was intended to promote competition and to block the formation of monopolies. *Standard Oil Co. v. FTC*, 340 U.S. 231, 249, 71 S.Ct. 240, 249, 95 L.Ed. 239 (1951). A general consensus holds that antitrust law "promote[s] consumer welfare by preserving the free private competitive market system as the principal institution for allocating resources and determining price and output." S. Chesterfield Oppenheim, Glen E. Weston & J. Thomas McCarthy, *Federal Antitrust Laws* 9 (1981) (citing commentary from diverse sources). The pro-competitive thrust of antitrust law also promotes non-economic "populist" goals. *See, e.g.*, 1 Philip Areeda & Donald F. Turner, *Antitrust Law* ¶ 103 (1978). When economic and social objectives conflict, however, courts generally give priority to economic objectives.[4]

---

**3.** Plaintiffs' memoranda of law alluded to, in the text and in footnotes, a number of arguments that were never developed. Although Plaintiffs raised none of these arguments at oral argument, the Court will address each briefly.

Plaintiffs raised three *pro forma* objections to Defendants' motion for summary judgment. The Court notes simply that there are no issues of "motive and intent" in this case because the Defendants have admitted, for purposes of this motion, that they conspired to withdraw from Maine; that this Court is not required to make any credibility determinations in deciding this motion; and that summary judgment is not an extreme and disfavored procedural device but rather is expressly designed to end cases in which the material facts are undisputed and one party is clearly entitled to judgment as a matter of law.

Plaintiffs also complained that it is too early in the course of discovery for the Court to consider a summary judgment motion. Plaintiffs' Memo at 8 n. 5, 14–15. Plaintiffs did not explain how further discovery will improve their likelihood of defeating this motion for summary judgment. Additional discovery will be largely be directed at gathering evidence regarding the Defendants' alleged conspiracy to withdraw from the Maine workers' compensation market. Plaintiffs would have to prove the alleged conspiracy if this case proceeded to trial. For purposes of this summary judgment motion, however, Defendants have admitted that they conspired. Furthermore, Plaintiffs agreed to the timing for Defendants' dispositive motion at the initial scheduling conference held in October 1991 knowing that it could be either a motion to dismiss or a summary judgment motion.

**4.** According to Areeda and Turner:
[D]irect legislation is a more effective and more appropriate method of promoting such other objectives. Within any plausible bounds of statutory interpretation, antitrust law can at best make only a marginal contribution to them. Moreover, the weighing and resolution of conflicting interests and objectives would involve the courts in essentially political decisions for which there are no workable legal standards, and would often place them in a regulatory or supervisory role for which they are ill-equipped.

Thus, antitrust law is primarily concerned with the interaction of private actors in the economic marketplace.

Not surprisingly, extension of antitrust principles to the political arena is highly problematic. First, the purpose and result of much political activity is to reduce competition and to favor politically influential groups, since regulation may serve private interests as well as the public interest. In politics, a successful conspiracy is called a majority. As the Supreme Court recently noted:

> The fact is that virtually all regulation benefits some segments of the society and harms others; and that it is not universally considered contrary to the public good if the net economic loss to the losers exceeds the net economic gain to the winners.

*City of Columbia v. Omni Outdoor Advertising, Inc.*, — U.S. —, —, 111 S.Ct. 1344, 1352, 113 L.Ed.2d 382 (1991). Thus, an antitrust challenge alleging an injury resulting from legislation is generally brought in a context in which a legislative body has determined that the pro-competitive policy of antitrust laws ought to be displaced.

Second, application of antitrust law to political activity may conflict with other, more fundamental, values. It is a basic premise of the American system of representative government—enshrined in the Free Speech and Petition Clauses of the First Amendment—that concerted efforts to influence legislation ought to be permitted, regardless of motive.

> The right of the people to inform their representatives of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so. It is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors.

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 139, 81 S.Ct. 523, 530, 5 L.Ed.2d 464 (1961) (holding

that a deliberately deceitful publicity campaign run by railroads that both promoted anticompetitive legislation and directly injured competing truckers is a form of political activity not prohibited by the Sherman Act). And, in a dual system of government, federal courts may not blithely apply federal antitrust law to invalidate state regulatory action, even if it is anticompetitive. *Parker v. Brown*, 317 U.S. 341, 352, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1943).

■ Third, antitrust laws are at best a blunt means of regulating political conduct. The antitrust laws do not provide a code of ethics for participation in the political process. *Noerr*, 365 U.S. at 140, 81 S.Ct. at 531. "The proscriptions of the [Sherman] Act, tailored as they are for the business world, are not at all appropriate for application in the political arena." *Id.* at 141, 81 S.Ct. at 531. Rather, limits on political behavior are to be found in legislation which deals explicitly with the evil sought to be eradicated. *Omni*, — U.S. at —, 111 S.Ct. at 1353 (citing the Hobbs Act, 18 U.S.C. § 1651 (prohibiting bribery)). *See also, e.g., Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (upholding limits on campaign contributions).

■ Antitrust law extends into the political realm in two limited circumstances: First, when the government is a commercial participant in a transaction and the anticompetitive conspiracy is directed at the government as a purchaser. *See, e.g., Omni*, — U.S. at —, 111 S.Ct. at 1351; *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). Second, when the "political activity" of a group of private actors is a mere sham which is not genuinely intended to influence legislation but only to injure competitors or consumers directly. *See, e.g., Omni*, — U.S. at —, 111 S.Ct. at 1354–55; *Noerr*, 365 U.S. at 144, 81 S.Ct. at 533.

■ The Supreme Court first considered whether the Sherman Act applies to anticompetitive state legislation almost fifty

1 Areeda & Turner, *Antitrust Law* ¶ 105.

years ago. In *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), a producer and packer of raisins challenged the California Agricultural Prorate Act ("Prorate Act") under the Sherman Act.[5] The Prorate Act "authorize[d] the establishment, through action of state officials, of programs for the marketing of agricultural commodities produced in the state, so as to restrict competition among the growers and maintain prices in the distribution of their commodities to packers." *Id.* at 346, 63 S.Ct. at 311. Although the program was virtually run by the producers themselves, the Supreme Court curtly rejected the antitrust challenge, holding that there is "nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature." *Id.* at 350, 63 S.Ct. at 313. According to the Court:

> It is the state which has created the machinery for establishing the prorate program. Although the organization of the prorate zone is proposed by producers, and a prorate program ... must also be approved by referendum of producers, it is the states, acting through the Commission, which adopts the program and which enforces it. . . .

*Id.* at 352, 63 S.Ct. at 314. Under *Parker*, it is clear that a plaintiff may not recover from a state for injuries caused by anticompetitive state legislation.

■■■ It is also clear that private actors who participate in ratesetting proceedings under anticompetitive state regulatory regimes are also entitled to "state action" immunity under *Parker* if state law articulates a clear and affirmative policy to allow anticompetitive conduct and the state actively supervises the anticompetitive conduct undertaken by the private actors. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum Co.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980); *see also FTC v. Ticor Title Ins. Co.*, —— U.S. ——, ——, 112 S.Ct. 2169, 2175, 119 L.Ed.2d 410 (1992); *Southern Motor Car-*

*riers Rate Conf., Inc. v. United States*, 471 U.S. 48, 56–57, 105 S.Ct. 1721, 1726–1727, 85 L.Ed.2d 36 (1985). During the relevant time period—after the 1987 legislation was enacted and the Defendants collaborated to propose the rate increases that allegedly injured the Plaintiffs—both prongs of the *Midcal* test were satisfied. The 1987 legislation indisputably created a regulatory regime in which uniform rates were required or authorized, and the Court is satisfied that the Superintendent of Insurance actively supervised the ratesetting process. The Superintendent of Insurance held adjudicatory hearings each year to review the rate proposals submitted by insurers; and each year, after thorough review, the Superintendent approved rate increases smaller than those the insurers requested. "[T]he State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties" which the state rubberstamped or failed to evaluate. *Ticor*, —— U.S. at ——, 112 S.Ct. at 2177. *See also Patrick v. Burget*, 486 U.S. 94, 100–101, 108 S.Ct. 1658, 1662–1663, 100 L.Ed.2d 83 (1988).

■■■ Approximately twenty years after deciding *Parker*, the Supreme Court addressed a closely related issue: whether a private actor can sue another private actor for seeking to influence the passage of anticompetitive legislation. In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), a group of truckers sued a group of railroads for running a deceptive publicity campaign that was designed to foster the adoption of laws that benefitted railroads and harmed truckers. The publicity campaign had the collateral—and not unintended—effect of injuring truckers' reputation with shippers. The Court first summarized the state action doctrine under *Parker*:

> [I]t has been held that where a restraint upon trade or monopolization is the re-

---

**5.** The producer also challenged the Prorate Act under the Agricultural Marketing Agreement Act of 1937, as amended, and the Commerce Clause.

sult of valid governmental action, as opposed to private action, no violation of the [Sherman] Act can be made out. These decisions rest upon the fact that under our form of government the question whether a law of that kind should pass, or if passed be enforced, is the responsibility of the appropriate legislative or executive branch of government so long as the law itself does not violate some provision of the Constitution.

*Id.* at 136, 81 S.Ct. at 529. The Court then continued:

We think it equally clear that the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly.

*Id.* The Court concluded that lobbying for anticompetitive legislation is protected as long as it is genuinely intended to influence legislation even if it has the incidental effect of causing direct injury to a competitor or consumer group. *Id.* at 143–144, 81 S.Ct. at 532–533.

*Noerr* noted that lobbying campaigns not intended to influence the passage of legislation, however, would not be protected because they would be mere "shams" designed to cause only direct harm to other private actors. *Id.* at 144, 81 S.Ct. at 533. There are no allegations in this case that the Defendants' alleged conspiracy to pressure the state into passing the 1987 Act was a mere sham. Without the 1987 Act, the Defendants would have been unable to request and receive the rate increases that Plaintiffs allege caused them injury.

Under *Noerr,* the political activity of the Defendants in seeking the influence the passage of the 1987 Act is clearly protected. In some respects, the Defendants' political activity is less objectionable than that of the railroads in *Noerr* itself. The insurers' conspiracy before the enactment of legislation in 1987 did not even have the incidental effect of causing direct harm to the Plaintiffs.

In its most recent discussion of both *Parker* and *Noerr, City of Columbia v. Omni*

*Outdoor Advertising, Inc.,* —— U.S. ——, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), the Supreme Court indicated that immunity from antitrust liability is lost only in limited circumstances. Omni Outdoor Advertising, a firm seeking to enter the billboard business in Columbia, South Carolina, challenged an alleged anticompetitive conspiracy between the city council and Columbia Outdoor Advertising, an established and politically well connected billboard advertiser. In particular, Omni claimed it had been injured by a zoning ordinance that restricted the size, spacing and location of billboards which "obviously benefitted" Columbia and "severely hindered" Omni's ability to compete. *Id.,* —— U.S. at ——, 111 S.Ct. at 1348. Omni argued that the City should be stripped of its immunity under *Parker* and Columbia Outdoor Advertising should be stripped of its immunity under *Noerr* because they conspired to restrain competition. The trial court permitted the case to proceed to trial where a jury found for Omni. Almost three years later, the trial court granted judgment notwithstanding the verdict to the city and Columbia Outdoor Advertising. *Id.* A divided panel of the Fourth Circuit reinstated the jury verdict. *Id.* The Supreme Court reversed, declaring, in effect, that no trial should have been held. *Id.*

The Supreme Court was asked by Omni to create an additional exception to immunity under *Parker* and *Noerr* when state actors and private actors have "conspired" to enact anticompetitive legislation. It declined to do so. According to the Court:

As we have described, *Parker* and *Noerr* are complementary expressions of the principle that the antitrust laws regulate business, not politics; the former decision protects the States' acts of governing and the latter the citizens' participation in government.

*Id.* —— U.S. at ——, 111 S.Ct. at 1355. A conspiracy exception to immunity under *Parker* and *Noerr* would require courts to treat most government regulatory action as if it were private rather than state action.

The impracticality of such a principle is evident if, for purposes of the exception, "conspiracy" means nothing more than an agreement to impose the regulation in question. Since it is both inevitable and desirable that public officials often agree to do what one or another group of private citizens urges upon them, such an exception would virtually swallow up the *Parker* rule....

*Id.,* —— U.S. at ——, 111 S.Ct. at 1351; *see also id.,* —— U.S. at ——, 111 S.Ct. at 1355 (same reasoning applies re: *Noerr*). The only exceptions to immunity under *Parker* and *Noerr* arise when the government is a commercial participant in a transaction, *id.,* —— U.S. at ——, 111 S.Ct. at 1351, or when the political activity is a mere sham, *id.,* —— U.S. at ——, 111 S.Ct. at 1354.

Legislation passed by Maine is subject to public scrutiny. There can be little doubt that any anticompetitive scheme adopted by the legislature and actively supervised by an administrative agency is the "State's own." *Ticor,* —— U.S. at ——, 112 S.Ct. at 2177. When enacting anticompetitive legislation, "States must accept political responsibility for actions they ... undertake." *Id.* —— U.S. at ——, 112 S.Ct. at 2178. If members of the public are disturbed by the consequences of an anticompetitive legislative program they may exercise their right to petition for different legislation and their right to elect different representatives. Anticompetitive state action may be addressed in a variety of ways, unlike a conspiracy wholly among private actors which can only be attacked in court. *See also* 1 Areeda & Turner, *Antitrust Law* ¶¶ 201, 204c.

The first of two Supreme Court cases on which Plaintiffs pin their argument is *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988). Although the Plaintiffs place a great deal of emphasis on *Allied Tube*'s admonition that courts should be sensitive to the "source, context, and nature of the anticompetitive restraint at issue," *id.* at 499, 108 S.Ct. at 1936 (paraphrased by Plaintiffs in Transcript at 25–26), Plaintiffs do not acknowledge the very different nature and context of that case. *Allied Tube* involved a challenge brought by a private actor against another private actor for anticompetitive lobbying fore a private standard setting organization. *Id.* at 500, 108 S.Ct. at 1937 ("The relevant context is thus the standard-setting process of a private association.") The Supreme Court held that the defendant's lobbying efforts were not entitled to immunity under *Noerr,* even if those private standards are often adopted by legislative bodies. "Given this context, petitioner does not enjoy the immunity accorded to those who merely urge the government to restrain trade.... Whatever de facto authority the Association enjoys, no official authority has been conferred on it by any government...." *Id.* Furthermore, "[u]nlike the publicity campaign in *Noerr,* the activity at issue here did not take place in the open political arena, where partisanship is the hallmark of decisionmaking, but within the confines of a private standard-setting process." *Id.* at 506, 108 S.Ct. at 1940. Private lobbying in private contexts has long been subject to antitrust scrutiny; private lobbying before public bodies has not. In short, there is ample reason to distinguish between wholly private conduct, like that held not immune in *Allied Tube,* and efforts to influence legislation in the political arena, like the Defendants' in this case.

Plaintiffs also rely on *FTC v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990), which created—or confirmed—the commercial participant exception to antitrust immunity. In *Trial Lawyers,* a group of attorneys who regularly accepted court appointments in the District of Columbia Superior Courts agreed to refuse to accept new cases if the D.C. Council failed to increase their fees by a set date. When that date passed, the lawyers initiated a boycott intended to force the District of Columbia to raise fees. Courts quickly became backlogged, and the D.C. Council raised fees.

Plaintiffs suggest that *Trial Lawyers* drastically limited the scope of *Noerr* immunity, quoting a passage which stated:

Respondents' agreement is not outside the coverage of the Sherman Act simply because its objective was the enactment of favorable legislation.

*Id.* at 424, 110 S.Ct. at 776. Plaintiffs, again, are insensitive to the particular "nature and context" of the challenged restraint and elide two critical distinctions. First, in *Trial Lawyers* the challenged activity directly injured the government as a commercial participant in the marketplace. The lawyers concerted refusal to accept new appointments prevented the government, as a consumer, from purchasing legal services for indigent criminal defendants. Second, the "restraint of trade ... would have had precisely the same anticompetitive consequences ... even if no legislation had been enacted." *Id.* at 425, 110 S.Ct. at 776. The *Trial Lawyers* boycott caused direct injury that antedated the legislation raising fees. The goal of the trial lawyers' conspiracy was to inflict economic pain on the government, forcing it to pass legislation. In this case, however, the Defendants' alleged conspiracy was not intended to harm the government as a commercial participant in the marketplace, only to prompt it to pass anticompetitive legislation. In this case, the Plaintiffs suffered no injury until after the anticompetitive legislation was enacted and the Superintendent of Insurance authorized a rate increase.

The Plaintiffs argue that this interpretation of the cases will "lead to the anomalous result that *unsuccessful* boycotts (*i.e.* boycotts which do not successfully coerce governmental action) would be antitrust violations, but that *successful* boycotts (*i.e.* boycotts to which government succumbs in order to force chaos or disaster would be immunized." Plaintiffs' Memo at 35–36 (emphasis in original); *see also* Transcript at 34. Their argument is not persuasive. An unsuccessful conspiracy would not amount to an antitrust violation—or, at least, would not give rise to a lawsuit—because the Plaintiffs would have suffered no injury. If the insurers were unable to prompt Maine to permit higher rates, then the Plaintiffs would not have paid higher premiums.

Nor are the Plaintiffs correct in asserting that Maine is, in effect, "retroactively immunizing" the Defendants' illegal activity. Again, although the coordinated political activity of the Defendants led to legislative change, the rate increase which allegedly harmed the Plaintiffs was not approved by the Superintendent of Insurance and levied by Defendants until after the Maine legislature authorized it. Plaintiffs would be justified in charging that retroactive immunity had been granted only if the injury they suffered had been inflicted upon them before the legislature authorized and the Superintendent approved the rate increase.

## IV. CONCLUSION

The Defendants' conspiracy to press for legislation permitting them to charge higher rates—which in and of itself caused Plaintiffs no injury—is immune under *Noerr.* The Defendants' participation in ratesetting proceedings after legislation was enacted in 1987 which permitted rate increases is immune under *Parker* and *Ticor.* Defendants' motion for summary judgment is, accordingly, GRANTED.

SO ORDERED.